UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles E. BERLING, Defendant-
Appellant.

No. 13900.

United States Court of Appeals
Seventh Circuit.

Oct. 10, 1963.

Rehearing Denied Nov. 22, 1963.

James K. Sommer and Richard P. Tinkham, Jr., Indianapolis, Ind., Briggs, Berner, Sommer & Tinkham, Indianapolis, Ind., of counsel, for appellant.

Richard P. Stein, U. S. Atty., David W. Mernitz, Asst. U. S. Atty., Indianapolis, Ind., for appellee.

Before DUFFY, SCHNACKENBERG and KILEY, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Charles E. Berling, defendant, has appealed from a judgment of the district court, on a jury verdict finding him guilty of aiding, abetting and counselling in the making and using of false documents, in violation of 18 U.S.C.A. §§ 1001 and 1002 [1] as charged in count II of an indictment.

The jury also found Berling guilty on count I, which charged a conspiracy to make false statements in violation of 18 U.S.C.A. § 371.[2]  Berling's motion for judgment of acquittal as to count I notwithstanding the verdict, was granted.[3]

---

[1]. "§ 1001.  Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

"§ 1002.  Whoever, knowingly and with intent to defraud the United States, or any agency thereof, possesses any false, altered, forged, or counterfeited writing or document for the purpose of enabling another to obtain from the United States, or from any agency, officer or agent thereof, any sum of money, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

[2]. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

[3]. Of 9 defendants who stood trial at the close of the government's evidence, the court sustained motions of judgment of

Defendant now asserts that the district court, having granted his motion for judgment of acquittal as to count I on the ground that the government had offered proof of more than one conspiracy, erred in denying his motion for judgment of acquittal as to count II. He argues that the error below rests in the failure of the court to determine that what it considered prejudicial joinder of separate conspiracies in count I, which named Berling, must be treated as equally applicable to him as a defendant under the aiding and abetting charge of count II.

A trial, the length of which is reflected in 3015 pages of a transcript of proceedings, produced evidence which we will, for the purpose of this opinion, condense.

This case involves the preparation for submission to the Army Finance Center at Fort Benjamin Harrison, Indianapolis, Indiana, of false and fraudulent allotment authorization forms (DA Form 1341) for the payment of life insurance premiums, and accompanying false and fraudulent transmittal letters (DD Form 379) listing the false 1341s. The originators of the bogus 1341 forms were various insurance agents and military personnel at Fort Dix, New Jersey, and Fort Jackson, South Carolina.

In the normal processing of form 1341, copies 1 and 5 would go to the Finance and Account Office at the serviceman's post, from which copy 1 would be forwarded under cover of a transmittal letter to the Army Finance Center at Fort Benjamin Harrison; copy 2 would go into the serviceman's data folder, maintained at his duty station; copy 3 would go to the serviceman himself; and copy 4 would go to the personnel office at his post.

Berling's counsel in his brief concedes that the evidence revealed from April or May of 1959 until August of 1960 "a range of abuses involving the solicitation of insurance within the jurisdiction of the Department of the Army of the United States which challenges the imagination". He also admits that regulations were violated in Fort Jackson, South Carolina and Fort Dix, New Jersey, and that "many of the defendants conspired with Sgt. Wallace E. Wilson in ways that involved the making of false, fictitious and fraudulent statements and representations and false writings and documents within the jurisdiction of the Department of Army of the United States".

Around June 1, 1960, National Security Insurance Company [4] received about 100 insurance applications which had been written at Fort Dix. On the basis of these and earlier applications, advances were made to agents in the amount of approximately $60,000. Roy Gordon, general agent under National's military director, became concerned over this volume of business at Fort Dix, because he was responsible for the money which had been advanced and he was not certain that the allotment forms were being · properly processed.

Zebbie Overstreet, agency director of National, on June 9, 1960, made a trip to the Finance Center at Fort Benjamin Harrison, at Indianapolis, where he was taken to Berling, Chief of the Receiving and Examination Branch of the Accounts Control Division of the Allotments and Deposit Operation. Overstreet furnished Berling with a copy of a transmittal letter bearing twenty names and asked Berling to check to determine if the allotments in question were being processed in the Finance Center. Berling checked and found that allotment forms had been received for eighteen of those listed. Overstreet then returned to Elba, Alabama, and, shortly thereafter, wired Berling $100 in appreciation for his cooperation.

On July 1, 1960, Overstreet called Berling at Indianapolis, person to person, and asked him to conduct a spot check about certain names that Overstreet had attempted to check at Fort Dix by sending Gordon there. Berling later called

---

acquittal as to 3 defendants, and reserved its ruling on whether count I should be dismissed in its entirety because of a fatal variance. The jury acquitted 2 defendants and found guilty 4 others, including Berling.

4. Herein described as "National".

back and advised Overstreet that there was a large volume of National business at Fort Benjamin Harrison; no check was made, however, of specific names. After Gordon returned to Elba, Alabama from Fort Dix, he and Overstreet again began to have fears that the business at Fort Dix was not being properly processed. On July 6, 1960, Overstreet again visited Berling at Indianapolis to check on the Fort Dix allotments. After an examination of his records, Berling advised Overstreet that there were no allotments in process for National from Fort Dix.

After further negotiations between Overstreet and Berling, on August 12, 1960 they entered into an agreement whereby 800 or 900 unprocessed 1341s which Overstreet had in his possession would be processed directly through the Finance Center, bypassing the various post finance offices. Berling was to supply Overstreet with authentic transmittal letters from military posts in the United States, having several 1341s attached. By referring to such authentic transmittal letters and 1341s, Overstreet could then complete the 1341s in his possession and prepare transmittal letters pertaining thereto. Overstreet gathered John Kayser, Charles Loring and Glenda Maddox (later Mrs. Glenda Roberts) at Indianapolis between August 13 and 16, where they assisted him and then went home a few days later. At about this time, Walter Miller, the supervisor of one of the examination sections of the Receiving and Examination Branch of which Berling was chief, requested one of the control clerks in the examination section to pull the longest transmittal letters she could find from posts which were listed on a sheet of paper Miller gave to her. She was advised that Berling wanted these transmittal letters. Once, subsequent to this initial request, Berling himself asked her for such transmittal letters. The transmittal letters and 1341s, which Berling asked for, were those which had been received in the mailroom but had not yet been started through the processing cycle in his branch so that the

1341s would still be attached. The date perforation stamps on the first page of the transmittal letters in evidence show that they were received at the Finance Center from August 12, 1960 through and including August 19, 1960, which dates coincide precisely with the dates that Overstreet and his associates were in Indianapolis

The evidence shows in detail how these transmittal letters were used and processed using a blank form supplied to Overstreet by Berling. When some 1341 forms and accompanying transmittal letters had been completed, Overstreet delivered them to Berling, who in turn delivered additional authentic transmittal letters and 1341s. These exchanges took place in a parking lot and a service station.

After the completion of work on the forms and transmittal letters, they were mailed to "C. Berling" at a post-office box at Indianapolis, which Berling had rented on August 22, 1960 shortly after Overstreet returned to Elba, Alabama. Berling surrendered his postoffice box on October 17, 1960, having used it just 5 days short of 2 months.

Although no definite amount had been agreed upon between Overstreet and Berling for Berling's services, Overstreet sent Berling from $100 to $200 a week over a period of three months. This money was mailed to Berling at the postoffice box in Indianapolis. Gordon also mailed $600 in cash to a box number in Indianapolis at Overstreet's instructions.

We find in the transcript considerable other evidence of a nature which tends to show Berling's knowledgeable participation in the activity in which Overstreet and his associates were engaged.

1. Berling phrases his contention in these words:

"The prejudice resulting when multiple conspiracies are joined in one count of an indictment, as in the present case, extends to another count of the same indictment alleging the commission of one of the

criminal purposes of the alleged conspiracy."

Obviously the culmination of the range of abuses, recognized by Berling's counsel, ante 3, required that processing of the illicit 1341 forms through the Indianapolis center be accomplished. That is where Berling had to be encountered. He was the bridge over which this unlawful scheme would have to pass before it could accomplish its purpose. There was abundant evidence from which the jury might find beyond a reasonable doubt that the guard at the bridge had proved disloyal to his duty. If he had been loyal, like Horatius at the bridge over the Tiber, he would have stopped these vandals who were bent upon their unlawful depredations. Instead, he abdicated his authority and betrayed his trust. If the jurors believed the evidence so proved, they would have had no difficulty or confusion in passing upon the question of Berling's guilt under count II, as shown by the evidence which also was relevant upon the question of the existence of a conspiracy or several conspiracies under count I.

On the other hand, the government argues that the district court erred in overruling the jury's finding that the evidence established a single conspiracy, and Berling was therefore not prejudiced by the reception and consideration of evidence proving that conspiracy. However, as we shall show, we find it unnecessary to pass upon that contention by the government. The real question involved, in Berling's attack on his conviction on the substantive charge of count II, is that at the trial testimony was received pertaining only to count I and that the testimony pertaining to Berling was intermingled with all the other testimony in the case. His counsel relies on the "dangers of transference of guilt from one to another across the line separating conspiracies", as referred to in Kotteakos v. United States, 328 U.S. 750, at 774, 66 S.Ct. 1239, at 1252, 90 L.Ed. 1557.

Both parties rely on United States v. Schaffer, 2 Cir., 266 F.2d 435, in which several defendants were tried and convicted on an indictment, the three counts of which charged interstate transportation of stolen merchandise by several of said defendants, and the fourth count of which charged all seven defendants with a conspiracy to transport stolen merchandise in interstate commerce. Two defendants pleaded guilty prior to trial and one defendant was granted a separate trial. At the close of the government's case, defendants rested and the court dismissed the conspiracy count, resulting in each defendant being found guilty of a substantive charge made against him.

The Schaffer defendants asserted they were prejudiced by the submission of the substantive charges to the jury, in view of the disposition of the conspiracy count. The court, 266 F.2d at 441, said:

"Moreover, there was nothing intrinsically complex about either the nature of the case, or of any testimony or exhibit, nor were the instructions of Judge Murphy to the jury in the slightest degree confusing or ambiguous. * * *"

Schaffer was affirmed in 362 U.S. 511, at 516, 80 S.Ct. 945, at 948, 4 L.Ed.2d 921, where the court said:

" * * * It appears that not only was no prejudice shown, but both the trial court and the Court of Appeals affirmatively found that none was present. We cannot say to the contrary on this record. Nor can we fashion a hard-and-fast formula that, when a conspiracy count fails, joinder is error as a matter of law. We do emphasize, however, that, in such a situation, the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear. * * *"

Consistent with Schaffer are our holdings in United States v. Rabin, 7 Cir., 316 F.2d 564, 568, and United States v. O'Brien, 7 Cir., 319 F.2d 437, 439.

We are unable to understand why Berling in his brief in this court cites our holding in United States v. Levi, 7 Cir., 177 F.2d 833, 837 (1949). The facts in Levi proved a situation in no material

respect similar to that involved in the case at bar. Levi turned on our views as to the effect of remarks made by the trial judge during a trial, which might have prejudiced the jury, and his questioning of the jury in a reproving manner in connection with a newspaper article. While we considered the facts in Levi required a reversal under the rule of Kotteakos, we consider that Kotteakos does not require a reversal because of the facts in the case at bar.

It is our conclusion that, not only no prejudice against Berling resulted from the fact that the jury heard much evidence, some of which was applicable only to the conspiracy count, but the evidence bearing upon the charge against Berling in count II was clearly delineated and so impressive in its simplicity that the jury had no difficulty in deciding from the relevant evidence whether Berling knowingly aided, abetted and counseled Overstreet and the other two persons named, in the commission of the offense of knowingly and unlawfully making and using a false document in a matter within the jurisdiction of the Department of the Army of the United States, then well knowing that it contained false and fictitious statements and entries. Berling's charge of prejudice has not been sustained.

For these reasons the judgment of the district court is affirmed.

Judgment affirmed.

KILEY, Circuit Judge.

I concur.

Though concurring, I share with the District Court the deep concern expressed over the joining of numerous defendants, twenty-five in this case, in a single conspiracy covering a wide space of time and distant places. There is danger of prejudice in joining a substantive count in the same indictment with a conspiracy count in which numerous defendants are joined, especially when the conspiracy is

connected by "extremely tenuous" ties as here.[1]

The prejudice to Berling is not indicated here. No specific claim of error substantially affecting Berling's rights is made on appeal. Presumably, therefore, it was recognized that the District Court took the necessary precautions to protect him from a "transference of guilt" from the unlawful joining of several conspiracies under Count One.

In this case there were sixty-nine witnesses testifying during the ten days' taking of testimony. At first blush this seems overpowering, but, as to Count Two, the witness Overstreet's testimony pertained principally to the guilt of Berling in aiding and abetting the crime to which Overstreet plead guilty. This fact aids the Government in sustaining Berling's conviction, since its effect was to throw a special spotlight on the proof of Count Two. In addition there is the discrimination shown by the jury in returning the verdict.[2] These facts militate against the notion of prejudice carrying over from the unlawful conspiracy count to the substantive count.

In the absence of any error in instruction, as in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), or in the absence of more than one substantive count charging defendants other than Berling with distinct substantive offenses, as in United States v. Bentvena, 319 F.2d 916 (2 Cir., 1936), and because of the obvious care with which the District Court considered the question of prejudice with respect to Count Two, there is no basis in the record for reversing the conviction of Berling.

The mere claim of transference of guilt from the fatally defective Count One to Count Two is not sufficient. However, once error is shown the courts are not reluctant to presume that the error was prejudicial to a defendant's substantial rights in a mass conspiracy trial.

---

1. See the dissenting opinion of Douglas, J., in Schaffer v. United States, 362 U.S. 511, 518, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960).

2. The cases of six defendants were submitted to the jury. Four, including Berling were found guilty, and two were acquitted.