A. A. DIETEMANN, Plaintiff,

v.

TIME, INCORPORATED, a New York corporation, Defendant.

Civ. No. 64–1235–CC.

United States District Court

C. D. California.

May 28, 1968.

A. L. Wirin and Paul M. Posner, Los Angeles, Cal., for plaintiff.

O'Melveny & Myers, Los Angeles, Cal., for defendant.

## OPINION

CARR, District Judge.

This is a diversity suit for invasion of privacy seeking $100,000.00 general damages and $200,000.00 exemplary damages. Plaintiff, a disabled veteran with little education, was engaged in the practice of healing with clay, minerals, and herbs—as practiced, simple quackery.

Defendant, Time, Incorporated, a New York corporation, publishes Life Magazine. Its November 1, 1963 edition carried an article entitled "Crackdown on Quackery." The article depicted plaintiff as a quack and included two pictures of him. One picture was taken at plaintiff's home on September 20, 1963, previous to his arrest on a charge of practicing medicine without a license, and the other taken at the time of his arrest.

Life Magazine entered into an arrangement with the District Attorney's Office of Los Angeles County whereby Life's employees would visit plaintiff and obtain facts and pictures concerning his activities. Two employees of Life, Mrs. Jackie Metcalf and Mr. William Ray, went to plaintiff's home on September 20, 1963. When they arrived at a locked gate, they rang a bell and plaintiff came out of his house and was told by Mrs. Metcalf and Ray that they had been sent there by a friend, a Mr. Johnson. The use of Johnson's name was a ruse to gain entrance. Plaintiff admitted them and all three went into the house and into plaintiff's den.

The plaintiff had some equipment which could at best be described as gadgets, not equipment which had anything to do with the practice of medicine. Plaintiff, while examining Mrs. Metcalf, was photographed by Ray with a hidden camera without the consent of plaintiff. One of the pictures taken by him appeared in Life Magazine showing plaintiff with his hand on the upper portion of Mrs. Metcalf's breast while he was looking at some gadgets and holding what appeared to be a wand in his right hand. Mrs. Metcalf had told plaintiff that she had a lump in her breast. Plaintiff concluded that she had eaten some rancid butter 11 years, 9 months, and 7 days prior to that time. Other persons were seated in the room during this time.

The conversation between Mrs. Metcalf and plaintiff was transmitted by radio transmitter hidden in Mrs. Metcalf's purse to a tape recorder in a parked automobile occupied by Joseph Bride, Life employee, John Miner of the District Attorney's Office, and Grant Leake, an investigator of the State Department of Public Health. While the recorded conversation was not quoted in the article in Life, it was mentioned that Life correspondent Bride was making notes of what was being received via the radio transmitter, and such information was at least referred to in the article.

The foregoing events were photographed and recorded by an arrangement among Miner of the District Attorney's Office, Leake of the State Department of Public Health, and Bride, a representative of Life. It had been agreed that Life would obtain pictures and information for use as evidence, and later could be used by Life for publication.

Prior to the occurrences of September 20, 1963, on two occasions the officials had obtained recordings of conversations in plaintiff's home; however, no pictures had been secured. Life employees had not participated in obtaining the recordings on these occasions.

On October 15, 1963, plaintiff was arrested at his home on a charge of practicing medicine without a license in violation of Section 26280, California Health and Safety Code. At the time of his arrest, many pictures were made by Life of plaintiff at his home. Plaintiff testified that he did not agree to pose for the pictures but allowed pictures because he thought the officers could require it. Also present were newspaper men who had also been invited by the officials to be present at the time of arrest.

Defendant contends that plaintiff posed for pictures at the time of his arrest and thus permission was given to take those pictures. As hereinafter pointed out, it is unnecessary to decide whether or not permission was given to take pictures at the time of his arrest.

Plaintiff, although a journeyman plumber, claims to be a scientist. Plaintiff had no listings and his home had no sign of any kind. He did not advertise, nor did he have a telephone.

He made no charges when he attempted to diagnose or to prescribe herbs and minerals. He did accept contributions.

Life's article concerning plaintiff was not published until after plaintiff was arrested but before his plea on June 1, 1964 of nolo contendere for violations of Section 2141 of the California Business and Professions Code and Section 26280 of the California Health and Safety Code (misdemeanors).

Plaintiff contends that under applicable California law there has been an invasion of his right of privacy. Defendant contends that since both the California and the United States Constitutions protect freedom of press and speech, the entry of its agents into plaintiff's quarters and the publication of the pictures taken there were privileged.

■ Since the article by Brandeis and Warren in 4 Harv.L.Rev. 193 (1890), the right of privacy has received more and more attention. Both writers and judges throughout the country have attempted to delineate the boundaries of the action for invasion of privacy. Despite the lack of unanimity in the decisions in the various states and the differences between the writers,[1] the law in California in a large measure has been settled. Since that law applies here,[2] it must be ascertained and applied.

The case of Melvin v. Reid et al., 112 Cal.App. 285, 297 P. 91, usually referred to as the *"Red Kimono"* case, appears to be the cornerstone case in which the right of privacy was defined. The court stated the applicable law as follows (297 P., page 82):

"The right of privacy may be defined as the right to live one's life in seclusion, without being subjected to unwarranted and undesired publicity."

In this case a motion picture was made of the life of a woman who had been a prostitute and who had been tried for murder and acquitted. The court apparently held that the use of incidents from her life was not actionable because those incidents appeared in public records, but that the use of her name was an invasion of her right of privacy guaranteed by the California Constitution. Among other things the court said the right of privacy is an incident of the person and not of property. It is purely a personal action. It does not exist where the published matter was consented to or where the person is so prominent that by his very prominence he has dedicated his life to the public, thereby waiving his right of privacy. In other words, there can be no privacy in that which is already public. The right of privacy can only be violated by printings, writings, pictures, or publications, not by word of mouth. The court also noted that the right of action accrues when the publication is made for gain or profit, but noted that this is, however, questioned in some cases.

Since the decision in *"Red Kimono,"* the California courts have dealt with the right of privacy in many cases.

In Coverstone v. Davies, 38 Cal.2d 315, 239 P.2d 876, the court stated at page 880:

"The gravamen of the tort is ordinarily the unwarranted publication by defendant of intimate details of plaintiff's private life."

In Britt v. Superior Court of Santa Clara County, 58 Cal.2d 469, 24 Cal. Rptr. 849, 374 P.2d 817, the court, in holding that the use of a peephole in a men's restroom resulted in an illegal search, noted at p. 819:

"Man's constitutionally protected right of personal privacy not only abides with him while he is the householder within his own castle but cloaks him when as a member of the public he is temporarily occupying a room—including a toilet stall—to the extent that it is offered to the public for private, however transient, individual use."

1. Compare—Prosser, 48 Calif.L.Rev. 383 (1960), with Kalven, 31 Law and Contemporary Problems 326 (1966).

2. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

Although Prosser in his article appears to say that intrusion without publicity may constitute an invasion of privacy, the California courts seem to require publication. ["*Red Kimono*," supra, and *Coverstone*, supra.]

The defenses interposed will now be considered. Defendant asserts first, and as its major contention, that the intrusion of the plaintiff's quarters and the pictures taken there at the time were privileged under the First Amendment of the United States Constitution, and Article I, Section 9, of the California Constitution.

■ At the outset defendant is met with the proposition that although freedom of speech and freedom of press are constitutional guaranties, so is the right of privacy. [Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510.] While the courts may be required under some circumstances to balance the rights and privileges when the constitutional guaranties of freedom of speech and press clash with the right of privacy, there would appear to be no basis to give greater weight or priority to any one of these constitutional guaranties.

It was said by the Supreme Court of California in Gill v. Curtis Publishing Company, 38 Cal.2d 273, 239 P.2d 630, at page 633:

"* * * The right of privacy does undoubtedly infringe upon absolute freedom of speech and of the press, and it also clashes with the interest of the public in having a free dissemination of news and information. These paramount public interests must be taken into account in placing the necessary limitations upon the right of privacy. But if this right of the individual is not without qualifications, neither is freedom of speech and of the press unlimited. The latter privilege is subject to the qualification that it shall not be so exercised as to abuse the rights of individuals. Accordingly, it is held by courts recognizing the right of pri-

vacy that the constitutional guaranties of freedom of speech and of the press do not warrant the publication of matter constituting an invasion of the right of privacy any more than they give the right to defame a person. * * *."

In *Gill*, photographs were taken of plaintiffs, husband and wife, sitting at their concession at Farmers' Market on stools on the patron's side of the counter. Plaintiff Gill had his arm around his wife with his cheek against hers. The picture was published in the Ladies Home Journal in connection with an article entitled "Love." A judgment for the defendant in the lower court was reversed by the California Supreme Court, holding that the complaint stated a cause of action.

In a related case, Gill v. Hearst Publishing Co., 40 Cal.2d 224, 253 P.2d 441, which involved the same facts as the previous *Gill* case, decided approximately a year earlier, the court held that the publication of the picture alone was not a violation of the right of privacy. It was pointed out that the picture was taken in the Farmers' Market, a public place, with several people present, and that under the circumstances there was a waiver of the right of privacy. The court did indicate that the publication of the picture with an article might give rise to a cause of action for violation of the right of privacy.

■ Defendant's claim that the plaintiff's house was open to the public is not sustained by the evidence. The plaintiff was administering his so-called treatments to people who visited him. He was not a medical man of any type. He did not advertise. He did not have a phone. He did have a lock on his gate. To obtain entrance it was necessary to ring a bell. He conducted his activities in a building which was his home. The employees of defendant gained entrance by a subterfuge.

If a person's home, or even his business premises, is to be subjected to in-

vasion by subterfuge for the purpose of obtaining facts concerning his private life, then privacy would not exist. It may well be that a professional man violating the law in connection with the practice of his profession should be arrested, prosecuted, and his activities suppressed, but it is inconceivable that the press or even a law enforcement officer can be permitted to obtain entrance by subterfuge for the purpose of photographing or observing those activities.

Defendant's contention that plaintiff's home was open to the public because he had given treatments to some people would lead to the conclusion that all business premises and homes in which illegal activities are carried on become public places because of such illegal activities. This is merely a resort to the proposition that the end justifies the means.

■ Defendant's contention that plaintiff consented to the taking of the pictures on September 20, 1963, cannot be sustained since it finds no support in the evidence.

Defendant next contends that plaintiff's activities were conducted in public view. It must be remembered that the invasion of privacy considered here relates to the picture taken without plaintiff's knowledge, in his house, prior to his arrest and prior to the filing of the criminal charges, and published in the article in question. It may well be that the information in the article and the pictures of plaintiff, obtained after the charges were filed and when he was arrested, related to matters of public interest and could be published as news. This need not be decided.

■■ It can hardly be concluded that plaintiff's activities in his house, whether in the presence of one or several people, are activities in the public view for the purpose of publication. If one had a meeting in his house for political or other purposes, unless such meeting was open to the public it does not follow that the activities are in the public view, permitting pictures to be taken and published without knowledge and consent. Such a conclusion would completely destroy the right of privacy.

■ It is also contended that plaintiff was a public figure because of his activities and, in particular, because he was engaged in the illegal practice of medicine and was suspected of being a criminal. There can be no question that a public figure includes anyone who has arrived at a position where public attention is focused upon him as a person. As was said in Cohen v. Marx et al., 94 Cal. App.2d 704, 211 P.2d 320, at page 321:

> "A person who by his accomplishments, fame or mode of life, or by adopting a profession or calling which gives the public a legitimate interest in his doings, affairs, or character, is said to become a public personage, and thereby relinquishes a part of his right of privacy."

See also: Metter v. Los Angeles Examiner, 35 Cal.App.2d 304, 95 P.2d 491, 495.

■ Plaintiff had no accomplishments which could possibly place him in the category of a public figure. His activities were those of a quack and they had not become public. Certainly one does not become a public figure solely because he is engaged in some illegal practice or because he is suspected of some criminal activity. It is only when the illegal practice or the criminal activity becomes public information that news of such activity may be disseminated in the public interest. Defendant's contention in this regard must therefore be rejected.

It is next contended that the employees of Life were agents of the law enforcement agencies and thus were obtaining evidence which would disclose criminal activities and which might be used to prosecute violations of the California law. Apparently defendant's contention is predicated on the premise that the search was by officers and their agents; thus evidence obtained might be used for a criminal prosecution, and since it could be and was used for that purpose

it became news or a matter of public interest, particularly after the charges were filed.

■■■■ Defendant's contention appears to carry with it the assumption of a lawful search. However, the legality of the search does not necessarily follow from plaintiff's failure to raise that issue in the criminal case, and the fact that he pleaded nolo contendere. Both the officers as well as their agents were subject to the restrictions of the Fourth Amendment, particularly where they were acting in concert. Certainly the activities of the officers and their agents (Life's employees) constituted a search. If the evidence obtained resulted from an illegal search under the Fourth Amendment, it of course could not be used in a criminal proceeding.

While the present case is not a criminal proceeding, the legality of the search must be considered since an illegal search would destroy defendant's premise that the pictures and recordings were lawfully obtained.

The decisions of the Supreme Court do not indicate that the search in the instant case was a lawful one.

On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270, would not resolve the matter since in that case the conversations recorded were in a "customer's room," a public place. Even so, this decision has been seriously questioned in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462.

In Lewis v. United States, 385 U.S. 206, at page 211, 87 S.Ct. 424, at page 427, 17 L.Ed.2d 312, the court stated:

" * * * Of course, this does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials; * * *."

Except for the statement of the court to the effect that an agent is not authorized to conduct a general search for incriminating materials, the case is not applicable here. The petitioner in *Lewis* had invited the agent into his home for the purpose of illegally selling him narcotics.

The case of Jack v. United States (9th Cir.), 387 F.2d 471, appears at first impression to be persuasive. An informant, who had been invited into the defendant's house, used a Fargo device to transmit their conversation to a narcotics agent. The court stated that the home had been converted into a commercial center, and followed Lopez v. United States, supra, but noted that the transmitted conversation was used "solely to corroborate informer's testimony."

■■■■ In the present case there was a search for incriminating facts without a warrant and without an arrest. The decisions of the courts do not support a conclusion that there was a lawful search. Assuming an illegal search, plaintiff's claim must now come to grips with defendant's contention that plaintiff's acts became news once the charges were filed against him, irrespective of the legality of the search. It may be that defendant is correct in theory, that is, that once pictures or facts are part of a public record they may be published. But here, defendant overlooks the critical facts of this case. Nowhere is there evidence that the pictures or for that matter the facts transmitted by radio transmitter to the agents ever became a part of any public record.

■■■■ Defendant thus must finally come to the position that because plaintiff was prosecuted all facts relating to his offenses became public information. If this be so, then the press may prepare a dossier on persons by illegal means, including trespass, pictures taken by hidden cameras in homes, offices, or other private places, conversations transmitted by radio transmitters, and even theft of material, then await a prosecution and publish everything which might in some degree relate to the offense charged, although such facts were not used as evidence or made a part of a public record. Such conduct cannot be justified under the right of freedom of the press.

To maintain the right of privacy and the right to be let alone is rapidly becoming more difficult. Already there are devices which may record the most secret and confidential conversations from substantial distances without entry on the premises and without any kind of equipment on such premises. There can be no peace if neighbors and friends, as well as enemies, vicariously join in the confidential discussions occurring in home, office, and places not open to the public. Merely knowing what your neighbor thinks about you may generate thoughts of mayhem, if not murder.

Those who insist upon absolute freedom of speech and press should remember the warning of Oscar Wilde in De Profundis that what one has done in the secret chamber one has some day to cry aloud from the housetops.

No freedom, including freedom of press or speech, can be permitted completely unbridled. Let it be hoped that it will not be said of us what was said of the Greeks in Rene Sedillot's History of the World:

> "They grew drunk on freedom, on argument and talk. This was the great age of Greek particularism, which produced masterpieces and paved the way for disaster."

While the claim in this case rests upon the theory that there has been an invasion of the right of privacy as protected under the California law, it would appear that the judgment for plaintiff may also be predicated on federal law. Perhaps the publicity required under California law would not be necessary under federal law.

The instant case is not altogether different in principle from the case of York v. Story (9th Cir.), 324 F.2d 450. In that case a woman who went to the police station to make a complaint was photographed in the nude and the pictures passed around among the police officers. The court upheld a cause of action alleged under Section 1983, Title 42, United States Code, stating at page 456:

> " * * * such acts constituted an arbitrary intrusion upon the security

of her privacy, as guaranteed to her by the Due Process Clause of the Fourteenth Amendment. * * * "

Many writers and judges have urged a broad construction of the Fourth Amendment to protect privacy. However, the right of privacy might be on more solid ground if it were premised on privacy as a part of liberty protected by the Due Process Clause of the Fifth and Fourteenth Amendments. [See: *Constitutional Right to Privacy*, by William M. Beaney, 1962 Sup.Ct.Rev. 212.]

If a case is alleged and proved under both the laws of California and the federal laws, the judgment may rest upon either or both of such laws. It is concluded that plaintiff has alleged and proved a case under the California law and also under federal law. The publication in Life Magazine on November 1, 1963 of plaintiff's picture taken without his consent in his home on September 20, 1963 was an invasion of his right of privacy under California law for which he is entitled to damages. The acts of defendant also constituted an invasion of plaintiff's right of privacy guaranteed by the Constitution of the United States which would entitle him to relief under Section 1983, Title 42, United States Code.

Plaintiff is entitled to damages for injury to his feelings and peace of mind. [Fairfield v. American Photocopy Equipment Co., 138 Cal.App.2d 82, 291 P.2d 194; 40 Cal.Jur.2d, Privacy § 3.] The injury is mental and subjective and difficult of ascertainment; however, the trier of fact is accorded a wide and elastic discretion. Plaintiff is awarded general damages in the amount of $1,000.00.

It is also within the discretion of the trier of fact to award exemplary damages. [Davis v. Hearst, 160 Cal. 143, 116 P. 530; Clark v. McClurg, 215 Cal. 279, 9 P.2d 505, 81 A.L.R. 908.] In view of the unusual facts of this case, it is concluded that the award of exemplary damages is not warranted. It cannot be overlooked that defendant's ef-

forts were directed toward the elimination of quackery, an evil which has visited great harm upon a great number of gullible people. Furthermore, if this decision correctly states the law, the publisher will undoubtedly be guided accordingly in the future.

Pursuant to Rule 52, F.R.Civ.P., this opinion shall constitute the findings of fact and conclusions of law.