Fortney H. STARK, Jr., et al., Plaintiffs,

v.

John B. CONNALLY, Jr., Secretary of the Treasury of the United States, et al., Defendants.

The CALIFORNIA BANKERS ASSOCIATION, Plaintiff,

v.

John B. CONNALLY, Jr., Secretary of the Treasury of the United States, et al., Defendants.

Nos. 72–1045, 72–1157.

United States District Court, N. D. California.

Sept. 11, 1972.

Henry Ramsey, Jr., Charles C. Marson, Peter Sheehan, American Civil Liberties Union Foundation of Northern California, Inc., San Francisco, Cal., and Neil Horton, Deene Solomon, Oakland, Cal., for plaintiffs Stark and others.

Philip E. Diamond, John M. Anderson, Edgar B. Washburn, Landels, Ripley & Diamond, San Francisco, Cal., for plaintiff California Bankers Assn.

James L. Browning, Jr., U. S. Atty., John M. Youngquist, Asst. U. S. Atty., Chief, Tax Div., San Francisco, Cal., and John J. McCarthy, Chief, General Litigation Section, Tax Div., Dept. of Justice, Washington, D. C., for defendants Connally and others.

## MEMORANDUM OF DECISION

Before HAMLIN,* Circuit Judge, and EAST and SWEIGERT, District Judges.

SWEIGERT, District Judge.

Plaintiffs in No. 72 1045 include several named individuals who are bank

---

* Judge Hamlin dissents in part.

customers, also the American Civil Liberties Association, suing on behalf of itself as a bank customer and also on behalf of such of its numerous members as are also bank customers; also a bank —the Security National Bank. The only plaintiff in No. 72 1157 is the California Bankers Association, suing on behalf of its membership, which comprises all California banks.

These plaintiffs seek to enjoin the Secretary of the Treasury from enforcing the provisions of the so-called Bank Secrecy Act, enacted by the Congress on October 26, 1970, to be effective May 1, 1971, and the Regulations issued thereunder on March 31, 1972 (but by their own terms not effective until July 1, 1972) upon the grounds that such enforcement poses grave and irreparable injury to their constitutional rights— their right to freedom from unreasonable search; their constitutional right of privacy; their privilege against self-incrimination; their right to due process as it may affect banks and bank customers, and also the right of private association protected by the First Amendment.

The Bank Secrecy Act (12 U.S.C. Sec. 1829b; 31 U.S.C. Secs. 1051–1122) requires banks and similar financial institutions to keep certain records and authorizes the Secretary of the Treasury to require such institutions and persons participating in transactions with such institutions to report financial transactions to the Secretary for the stated reason (Sec. 1051) that such records and reports have a high degree of usefulness in criminal, tax and other regulatory investigations.

The record-keeping provision of the Act is 12 U.S.C. Sec. 1829b—implemented by Treasury Regulation 31 C.F.R. sub-part C, Secs. 103.31–103.37. Section 1829b(b)(c)(d) broadly requires financial institutions to maintain, not only customary ledger card records for commercial and savings accounts, but also to maintain microfilm of all checks, drafts or similar instruments drawn on or presented for payment or received for deposit or collection—an authorization which the Secretary has implemented (Regulation 103.31–103.37) with exceptions only for large accounts involving dividend, payroll or employee and medical benefit checks.

The temporary restraining order heretofore issued in this case has not been directed to the record-keeping provisions of the Act, and since we find no constitutional violation in these record-keeping provisions, as such, we reject plaintiffs' contentions insofar as those portions of the Act are concerned.

Turning, however, to the reporting provisions of the Act, those provisions are contained in Title 31 U.S.C. Secs. 1081, 1082, 1083, 1101 and 1121 and have been implemented by Treasury Regulations 31 C.F.R. Part 103, sub-part B, Secs. 103.-21–103.26. These reporting provisions fall into two categories: (1) Those relating to *foreign* financial transactions (Secs. 1101 and 1121), and (2) those relating to *domestic* financial transactions (Sec. 1081).

Since, in our opinion, the reporting provisions relating to foreign transactions present no great problem we will first dispose of plaintiffs' challenges to those provisions.

## REPORTING OF FOREIGN FINANCIAL TRANSACTIONS

31 U.S.C. Sec. 1101 (Reports of Exports and Imports of Monetary Instruments) provides in substance that whoever knowingly transports monetary instruments from the United States or into the United States or receives such at the termination of the transportation to the United States in an amount exceeding $5,000 shall file a report in such form and detail as the Secretary may require setting forth certain specified (sub. b) information—with certain qualifications (sub. c) as to common carriers.

Regulation 103.23 (Reports of Transportation of Currency or Monetary Instruments), implementing Section 1101, excepts transfers through normal banking procedures and makes some other exceptions (sub. c).

31 U.S.C. Sec. 1121 (Foreign Transactions) provides in substance that the Secretary of the Treasury, having due regard for the need for controlling export and import of currency and also due regard to avoidance of unreasonably burdening legitimate transactions with foreign financial agencies, shall by regulation require residents of the United States, who engage in any transaction with a foreign financial agency, to maintain records or file reports, or both, setting forth such of the certain stated information as the Secretary may require. (See also, Sec. 1122).

Regulation 103.24, implementing Section 1121, provides in substance that each person subject to the jurisdiction of the United States, having a financial interest in a bank, securities or other financial account in a foreign country, shall report such relationship as required on his federal income tax return.

We are of the opinion that these portions of the Act, dealing with export and import of monetary instruments and with foreign monetary interests or accounts, do not violate any constitutional provision.

First of all, there is the general rule (which must always be the point of departure in cases calling for judicial review of legislation enacted by the Congress), that the wisdom of legislation and the need for it are matters for the Congress to decide and the Courts should not substitute their judgment for that of the Congress. (See, Justice Stewart dissent in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) at 526.) The foregoing reporting provisions of the Act are limited to a narrowly described area of international financial transactions and the Congressional decision falls within the general rule.

The Supreme Court, when dealing with matters of reporting to and surveillance by the executive, has traditionally recognized a distinction between domestic surveillance, on the one hand, and surveillance where foreign nations are involved, pointing out that what might be impermissible in domestic cases may be constitutional where foreign powers are involved. See, United States v. United States District Court, 407 U.S. 297, pp. 2132, 2133, p. 2139, 92 S.Ct. 2125, 32 L. Ed.2d 752 (1972).

Furthermore, the Act contains procedural protections applicable to its provisions for reporting these foreign transactions. For example, with respect to enforcement of Section 1101, the Act (Section 1105) provides that, if the Secretary has reason to believe that monetary instruments are being transported without reporting or with false reports, he may apply to the Court for a search warrant. Similarly, with respect to enforcement of Section 1121(b) (foreign transactions) that section provides that no person required to maintain records under the section shall be required to produce or disclose the same except with a duly authorized subpoena or summons as may be otherwise required by law.

We conclude that these provisions violate no constitutional guarantee and that, since these provisions, requiring report of certain foreign financial transactions, are clearly separable from provisions pertaining to the reporting of domestic financial transactions, plaintiffs' motion for a preliminary injunction as to the former is denied.

## REPORTING OF DOMESTIC FINANCIAL TRANSACTIONS

A more formidable problem is presented by the Act's provisions authorizing the Secretary to require reporting to him by financial institutions, and also by persons participating in transactions with them, of domestic financial transactions.

31 U.S.C. Sec. 1081 (Domestic Currency Transaction-Reports) provides that transactions involving any financial institution shall be reported to the Secretary at such time and in such manner, and in such detail, as the Secretary may require, if they involve the payment, receipt or transfer of United States currency or such other monetary instruments, as the Secretary may specify, in such

amounts, denominations, or both, or under such circumstances, as the Secretary shall by regulation prescribe.

Section 1082 provides that the report of any such transaction shall be signed or otherwise made both by the domestic financial institutions involved and by one or more of the other parties thereto or participants therein as the Secretary may require.

Regulation 103.22 (Reports of Currency Transactions), which partially implements these sections, requires financial institutions to report transactions involving currency of more than $10,-000.

It will be noted that, although to date the Secretary has required reporting only by the financial institutions and then only of *currency* transactions over $10,-000, he is empowered by the Act, as indicated above, to require, if he so decides, reporting not only by the financial institution, but also by other parties to or participants in transactions with the institutions and, further, that the Secretary may require reports, not only of currency transactions but of any transaction involving any monetary instrument—and in any amount—large or small.

Since, as already noted, the record-keeping provisions of the Act require banks to microfilm all checks, drafts or similar instruments drawn on or presented to or received for deposit or collection by a bank, and since, as noted, the Secretary may require reporting not only by the bank, but also by the other parties to, or participants in, any bank transaction, the required report can include, not only the bank's usual record of its customer's account, but also such information as is disclosed on the face or back of any check, draft or similar monetary instrument—i. e., information concerning the identity of the persons, firms or organizations with whom the drawer has chosen to deal and, further, such additional "detail" concerning the transactions "as the Secretary may require" from both

the bank and other parties or participants.

These reporting provisions of the Act must be considered along with other general provisions, e. g., Section 1053 which vests broad power in the Secretary to prescribe such regulations as he may deem appropriate to carry out the purposes of the Act; also under Section 1055 the Secretary may make and revoke exemptions from the Act's requirements as he may deem appropriate; these exemptions may be conditional or unconditional, by regulation or by order or by licensing, and they may relate to particular transactions or to particular parties. The Secretary has broadly implemented these authorizations in his Regulation 103.45, providing that in his sole discretion he may by written order make exceptions or exemptions or impose additional record-keeping or reporting requirements authorized by the statute or otherwise modify the requirements of the regulations.

Further, Section 1061 provides that the Secretary of the Treasury shall, upon such conditions and procedures as he may by regulation prescribe, make any information set forth in the required reports available, for any purpose consistent with the provisions of the Act, to any other federal agency at its request.

The question is whether these provisions, broadly authorizing an executive agency of government to require financial institutions and parties to or participants in transactions with them, to routinely report to it, without previous judicial or administrative summons, subpoena or warrant, the detail of almost every conceivable financial transaction as a surveillance device for the discovery of possible wrongdoing on the part of bank customers, is such an invasion of a citizen's right of privacy as amounts to an unreasonable search within the meaning of the Fourth Amendment.[1]

That there is such a thing as a constitutionally protected "right of privacy" has been recognized by the Supreme

---

1. It will be noted that anyone who refuses to so report does so upon peril of criminal prosecution under Section 1058.

Court in such cases as Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) and most recently in United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).[1(a)]

In Katz v. United States, supra, the Supreme Court, holding that government eavesdropping violated the right of privacy upon which a person relied while using an otherwise public telephone booth, said: "The Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See, Lewis v. United States, 385 U.S. 206, 210 [87 S.Ct. 424, 427, 17 L.Ed.2d 312] (1966); United States v. Lee, 274 U.S. 559, 563 [47 S.Ct. 746, 748, 71 L.Ed. 1202] (1927). But what he seeks to preserve as private, even in an area accessible to the public may be constitutionally protected. See Rios v. United States, 364 U.S. 253 [80 S.Ct. 1431, 4 L.Ed.2d 1688] (1960); Ex parte Jackson, 96 U.S. 727, 733 [24 L.Ed. 877] (1877) . . . No less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely on the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call, is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication."

Harlan, J., concurring at 389 U.S. pp. 360–361, 88 S.Ct. at p. 516, concerning what is meant by privacy, added: "My understanding of the rule . . . is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'."

In the recent case of United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) the Supreme Court, considering a presidential claim of legal right to wire tap telephone conversations (without court approval) when deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert its existing form of government, again unanimously held that the Fourth Amendment shields such a conversation from surveillance; that the government's duty to safeguard domestic security must be weighed against the potential danger that unreasonable surveillances pose to individual privacy; that Fourth Amendment freedoms cannot be properly guaranteed if domestic security surveillances are conducted solely within the discretion of the executive branch without the detached judgment of a neutral magistrate, especially when resort to appropriate warrant procedure would adequately serve the legitimate purposes of domestic security searches.

In City of Carmel v. Young, supra, the California Supreme Court, citing the principle laid down by the Supreme Court of the United States in Griswold v. Connecticut, supra, held that a statute requiring public officials and candidates for public office to disclose investments in excess of $10,000, although a laudable and proper legislative concern with possible conflicting interests of public servants, was, nevertheless, an invalid intrusion upon the right of privacy protected by the Fourth Amendment.

Does the constitutional principle laid down by the Supreme Court in the above cases apply in the present case where the

---

1(a). See also, Doe v. McMillan, 143 U.S. App.D.C. 157, 442 F.2d 879 (1971); York v. Story, 324 F.2d 250 (9th Cir. 1963); Zimmermann v. Wilson, 81 F.2d 847, 849 (3d Cir. 1936). But see, 25 F.Supp. 75 (1938), aff'd in 105 F.2d 583, 586 (1939); Dietmann v. Time, Inc., 284 F.Supp. 925 (C.D.Cal.1966); City of Carmel v. Young, 2 Cal.3d 259, 85 Cal. Rptr. 1, 466 P.2d 225 (1970); Brex v. Smith, 146 A. 34 (New Jersey 1929).

government claims legal right to maintain routine surveillance, without summons, subpoena or warrant, over the details of citizens' financial transactions with banks and similar financial institutions for the broadly stated purpose of helping executive agencies of the government to investigate, not only tax and criminal matters, but also other unspecified "regulatory investigations"?

■■ At the outset we must note the holdings in this and other circuits that communications between banks and their customers are not privileged communications in the technical sense of that term; that bank customers have no rights in bank records; that such records may be subpoenaed from the bank, even over the objection of the depositor, notwithstanding the fact that the records concern the customer's account; that customers have no standing to object to subpoenas requiring their bank to produce records of the customer's accounts and that the production by the bank of its records under subpoena is not, as to the customer, either a Fourth Amendment illegal search and seizure nor a Fifth Amendment self-incrimination. Harris v. United States, 413 F.2d 316 (9th Cir. 1969). See also, Galbraith v. United States, 387 F.2d 617 (10th Cir. 1968); Application of Cole, 342 F.2d 5 (2d Cir. 1965); De Masters v. Arend, 313 F.2d 79, 85 (9th Cir. 1963).

It seems, therefore, that bank customers have no recognizable right to claim invasion of their privacy merely because a government agency, by summons or subpoena, requires a bank to produce the bank's own records pertaining to the customer's financial transactions.

It will be noted, however, that the cases enunciating this rule all involved situations in which (1) the government agency was seeking only the bank's own records of the customer's account, and (2) the government agency was following established procedures for obtaining such records by means of judicial or administrative summons, subpoena or warrant, e. g., 26 U.S.C. Sec. 7602 et seq.,

and (3) the government agency was seeking records claimed to be relevant and material to a specific matter then under inquiry, i. e., the correctness of a particular taxpayer's return.

In the operation of the domestic financial transaction reporting provisions of the Act here in question, none of these elements are present.

The power of the Secretary under the Act in question to require reports is not limited to the bank's own records or to information based thereon, e. g., the bank's ledger card record of the state of the customer's account or its own deposit slips or passbook entries. As already indicated, the Act goes much further to authorize the mandatory disclosure of information obtainable from microfilming checks and drafts and also detail information required from the parties to and participants in each transaction.

We do not consider it necessary to pass upon the technical question whether customer's checks, as such, become the property of the bank during the banking process. We do note, however, that banks have traditionally returned, either directly or through the clearing house, all checks each month to the original drawer of the checks. It would seem reasonable therefore, for the drawer of a check to regard himself as the real owner of his checks, subject only to normal banking processing, and to expect that detailed information shown only on the face of his checks will not be automatically broadcast throughout the vast government bureaucracy without at least some notice, summons, subpoena or warrant in connection with some legitimate pending inquiry.

■ Certainly, at least, a bank customer reasonably expects privacy concerning details of his personal financial affairs not shown on either the bank's own records or on the face of the customer's checks and which must be disclosed only by the report required of the bank customer, himself, as a party to or participant in a financial transaction.

■ It would seem that, within these limitations, and within the meaning of

*Katz,* supra, a bank customer does expect a degree of privacy in these matters and that such an expectation is one that society has been prepared to recognize as "reasonable."

As stated by the Supreme Court of California in City of Carmel v. Young, supra (Burke, J.) (2 Cal.3d p. 268, 85 Cal.Rptr. p. 7, 466, P.2d p. 232): "In any event we are satisfied that the protection of one's personal financial affairs and those of his (or her) spouse and children against compulsory public disclosure is an aspect of the zone of privacy which is protected by the Fourth Amendment and which also falls within that penumbra of constitutional rights into which government may not intrude absent a showing of compelling need and that the intrusion is not overly broad" . . . "the law must be shown 'necessary, and not merely rationally related to, the accomplishment of a permissible state policy.' Griswold v. Connecticut, *supra,* 381 U.S. 479, 497, 85 S.Ct. 1678, 1689, 14 L.Ed.2d 510. 'The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.' Shelton v. Tucker, *supra,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231."

The Act challenged in our pending case makes no provision for any summons, either judicial or administrative, as the means whereby the Secretary can demand reports from banks and their customers concerning the details of their financial transactions. He is empowered to peremptorily require such reports routinely — automatically — from the banks and from all parties and participants in financial transactions without any procedure whereby either the bank or the customer may in advance test the reasonableness of the demand.

Section 7602 et seq., of the Internal Revenue Act of 1954 (26 U.S.C.), already above mentioned, establish procedures whereunder the Secretary of the Treasury, for the limited purpose of ascertaining the correctness of an individual's tax return, may summon the person liable or any person having possession or care of books of account relating to the business of that person or any other person, to appear and to produce such records and to give testimony as may be relevant or material to such inquiry.

Under these procedures the ultimate enforcement of the summons can be judicially controlled when challenged either by the bank or by the customer-taxpayer himself as an intervening third party interest whose financial transactions are involved. Reisman v. Caplin, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964).[2]

The Act here in question contains no such procedural safeguards with respect to reporting of domestic transactions as are contained in this existing law whereunder the Treasury is already given

---

2. It is true that in Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971) the Court limited to some extent the holding of *Reisman* that the customer-taxpayer would have a right to intervene in the summons proceedings, holding that such a right to intervene is not absolute; that for example, there would be no right to intervene when the taxpayer has no proprietary interest in the summoned records (his sole interest being that they presumably contain details of payments to him) ; that, since he has no other protectible interest by way of privilege or otherwise, he had no absolute right to intervene; that an IRS summons may be issued in connection with a tax investigation if it is issued *in good faith and prior to any recom-* mendation for criminal prosecution. But, as pointed out by J. Douglas, concurring (p. 536, 91 S.Ct. p. 545), a taxpayer would clearly have standing to raise a claim of violation of his constitutional rights if a third party were ordered to produce records belonging to the taxpayer, citing United States v. Kordell, 397 U.S. 1, 7, 90 S.Ct. 763, 25 L.Ed.2d 1; and Reisman v. Caplin, 375 U.S. 440, 445, 84 S.Ct. 508. Further, legislation is now pending in Congress to modify any effect of *Donaldson* by providing that the government, when acting under IRS statutes, must first get the consent of the bank customer or show cause to obtain bank records concerning the customer.

ample but orderly opportunity to investigate tax violations by citizens.

Further, the Act presents the question whether there is any reasonable relationship between the end sought to be achieved, i. e., possible assistance to the government in its investigations of citizens, on the one hand, and on the other hand, the peremptory, sweeping, unsafeguarded reporting provisions which it authorizes the Secretary to require.

■ There can be no question about the power of Congress to require records and reports from business entities and citizens (United States v. Morton Salt, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950)) provided, however, that any such records or reports bear some reasonable relationship to the matters under inquiry. See Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696 (1924), where the Court held that "a governmental fishing expedition into the papers of a private corporation, on the possibility that they may disclose evidence of crime, is so contrary to first principles of justice, if not defiant of the Fourth Amendment, that an intention to grant the power to a subordinate agency will not be attributed to Congress unless expressed in most explicit language" . . . and . . . "access is confined to such documents as are relevant as evidence to the inquiry or complaint before the commission. . . . "

In Shapiro v. United States, 335 U.S. 1, at 32–33, 68 S.Ct. 1375, at 1391, 92 L.Ed. 1787 (1948) the Supreme Court recognized that "There are limits which the government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself," adding, "But no serious misgivings that those bounds have been overstepped would appear to be evoked when there is a sufficient relation between the activity sought to be regulated and the public concern so that the government can constitu-

tionally regulate or forbid the basic activity concerned, and can constitutionally require the keeping of particular records, subject to inspection by the Administrator."

Various tests have been formulated to ascertain the reasonableness of a search and seizure, e. g., a search is unreasonable when "it is out of proportion to the end sought" (McMann v. Securities & Exchange Commission, 87 F.2d 377, 379 (2d Cir. 1937, J. Learned Hand), "balancing the need to search against the invasion which the search entails." Camara v. Mun. Ct., 387 U.S. 523, 87 S. Ct. 1727, 18 L.Ed.2d 930 (1967); "a nexus . . . between the item to be seized and criminal behavior." Warden v. Hayden, 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

As compared with the relatively specific and certainly vital national interests involved in United States v. United States District Court, supra, i. e., subversion of our form of government, which the Supreme Court has held, nevertheless, insufficient to justify invasion without prior judicial approval, of conversational privacy by wire tap surveillance, the stated reason given in the Act now in question, for invasion of bank customers' reasonable expectation of a degree of privacy, i. e., the mere general possibility that such surveillance will help in criminal, taxation and unspecified governmental investigations, is far more vague and far less convincing.

The same may be said of City of Carmel v. Young, supra, wherein the court held that even such an important and specific subject of legislative concern as conflict of interest among public employees was insufficient to justify an overbroad invasion of one's right of privacy in his financial affairs.

How far-fetched is the relationship between the surveillance authorized by this Act and the general expectation that it may uncover wrongdoing is indicated in its legislative history wherein an Assistant Secretary of the Treasury, testifying before a Congressional Committee stated: "We believe that the imposition

of an all-encompassing requirement to photograph all checks drawn on U. S. banks . . . could be impractical, wasteful, and counter-productive. In excess of 20 billion checks are drawn annually in the United States and flow through the banking system and only a small percentage of these are likely to be of use in criminal, tax or regulatory investigations and proceedings." Senate Hearings, p. 178.

Similarly a Commissioner of Internal Revenue testified as follows: " . . . Realistically, however, the creation of a mass of paper beyond our capacity to digest and utilize could have the effect of submerging and making unobtainable information of special interest to us. In other words, a rifle rather than a shotgun may represent the best approach to the problem." House Hearings, p. 68.

Remarkably, the government in its brief (7/13/72, p. 5) seems to recognize these considerations by interpreting the reporting provisions of the Act to mean that: " . . . Nothing in the statute gives the government any greater right to *access* to bank records than it possessed before. Consequently, *whenever the federal government desires to inspct any bank records kept under the provisions of the new statute, the federal government must resort to using an administrative summons or judicial subpoena as it did in the past.* Upon the issuance of such a summons or subpoena, if the bank customer felt that the use of the summons or subpoena constituted an illegal search and seizure under the Fourth Amendment, that contention could be contested in court in the same manner as it heretofore has been contested." (emphasis added).

Of course, if the government intends to obtain the information contemplated by the reporting provisions of the Act only through use of administrative summons or judicial subpoena, as it has done in the past under existing law, then one may well question the need for this new legislation. However, we must look, not merely to what the government says it intends to do, but to the much broader authorization of the Act itself.

For the reasons above set forth we are of the opinion that the Act in question, insofar as it authorizes the Secretary to require virtually unlimited reporting from banks and their customers of domestic financial transactions as a surveillance device for the alleged purpose of discovering possible, but unspecified, wrongdoing among the citizenry, so far transcends the constitutional limits, as laid down by the United States Supreme Court for this kind of legislation, as to unreasonably invade the right of privacy protected by The Bill of Rights, particularly the Fourth Amendment provision protecting "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures."

We therefore, deem it unnecessary to consider plaintiffs' claims based upon the Fifth Amendment privilege against self-incrimination, the Fifth Amendment requirement of due process, and the First Amendment protection of freedom of association.

Plaintiffs' motion in the above consolidated cases for a preliminary injunction is granted to the extent of enjoining defendant from enforcing the reporting provisions of the Act concerning domestic financial transactions—but in no other respect.

This Memorandum constitutes the findings and conclusions of the Court within the meaning of Rules 52 and 65 of Federal Rules of Civil Procedure.

HAMLIN, Circuit Judge (dissenting and concurring):

I concur in that portion of the majority opinion in the above case which upholds the constitutionality of 31 U.S.C. §§ 1101, 1121 and 1122, and the Treasury regulations implementing said sections.

I respectfully dissent, however, from that portion of said opinion which holds that 31 U.S.C. §§ 1081, 1082 and 1083 relating to domestic banking transactions are unconstitutional.

As I see it, there is no essential difference between the statutes covering domestic and those covering foreign banking requirements. The majority opinion refers to no authority which is directly on point. The references therein to cases involving conversational privacy are to me inapposite. Any person or organization using banks for their own purposes does so knowing that the Code sections in question permit access to bank records by the government and reports by the banks concerning those records.

Courts should be slow in finding a Congressional enactment unconstitutional.

In this case, if any hardships result by reason of these statutes, application can be made to Congress for relief.