Richard ROE, an infant, by Robert Roe, his parent, et al., Plaintiffs,

and

George Patient et al., Intervenors,

v.

Hollis S. INGRAHAM, as Commissioner of Health of the State of New York, Defendant.

No. 73 Civ. 1303.

United States District Court,
S. D. New York.

Aug. 23, 1973.

Michael Lesch, New York City (Barry L. Mendelsen, Solomon Z. Ferziger, Shea, Gould, Climenko & Kramer, New York City, of counsel), for plaintiffs.

Miles Jaffe, New York City (Norwick, Raggio & Jaffe, New York City, of counsel), for intervenors.

A. Seth Greenwald, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel H. Hirschowitz, First Asst. Atty. Gen., of counsel), for defendant.

Before FEINBERG, Circuit Judge, and WYATT and CARTER, District Judges.

## OPINION

ROBERT L. CARTER, District Judge.

### I

*Statute Under Attack:*

This action challenges the constitutionality of certain provisions of the New York State Controlled Substances Act (the "Act"), New York Laws 1972, ch. 878, N.Y. Public Health Law § 3300 et seq. (McKinney's Consol.Laws, c. 45, Supp.1972) effective April 1, 1973, as amended, New York Laws 1973, ch. 97, ch. 163, ch. 728. The Act attempts a comprehensive regulation of all facets of the legitimate drug trade—research, manufacture, medical prescription, wholesale and pharmaceutical distribution—in an effort to prevent and discover any diversion of this trade to illegitimate use.

The provisions of the Act apply to "controlled substances"—those drugs warranting regulation—which are described in detail in § 3306. Furthermore, that section classifies the regulated drugs into "schedules" depending upon the extent to which the drugs may be lawfully prescribed for medical purposes and the dangers inherent in their misuse. Thus, Schedule I drugs "are all highly abusable substances which have no current medical use or lack accepted safety for use in treatment under medical supervision in this country." Interim Report of the Temporary State Commission to Evaluate the Drug Laws ("Interim Report") at 13.[1] These drugs may not be prescribed, distributed or possessed for any purpose other than the strictly limited use described in Title III, §§ 3324–3329, pertaining to research and related activities, § 3330.

Schedule II contains "those substances which have a high potential for abuse, but also have an accepted or restricted medical use. Abuse of a Schedule II substance may lead to severe physiological dependence." Interim Report at 13. Schedules III, IV and V list those drugs having an accepted medical use but a potential, though in decreasing degree, for psychological and/or physiological dependence consequent to misuse.

The Act requires that an official New York State prescription form[2] be used to prescribe or dispense Schedule II drugs, § 3338(2)[3], except in cases of

---

1. The Temporary State Commission to Evaluate the Drug Laws was created in 1970 to investigate the problems arising under existing drug laws and to recommend changes in the law. New York Laws 1970, ch. 474, as amended by New York Laws 1971, ch. 7. The Committee's recommendations as contained in the Interim Report were adopted by the legislature virtually without modification.

2. These forms are to be prepared and issued by the Department of Health, numbered serially, prepared in triplicate and issued to practition-

ers in groups of one hundred at a cost of $10 per group (10¢ per triplicate form), § 3338.

3. The statute authorizes the Commissioner of Health to require any particular Schedule III or IV drug to be prescribed or dispensed only upon an official prescription form, § 3338 (3), but the court has no knowledge that such discretionary power has been exercised or that notice of an intention to do so has been given and issues concerning these schedules are not before us.

emergencies § 3334. This triplicate form must contain the following information: the name, address and age of the patient; the name, address, registration number, telephone number and handwritten signature of the physician, directions for use (e. g., dosage, frequency of dosage and maximum daily use), and date the prescription was signed, § 3332.

In the event the drug is actually administered or dispensed by the prescribing physician, the doctor must retain a copy of the form in his files for a period of five years and file the original and one copy with the Department by the fifteenth day of the month following the month in which the drug was dispensed, § 3331(6). If, however, the prescription is to be dispensed by a pharmacist, the doctor shall keep one copy of the form in his files for a period of five years and deliver to the patient the original and one copy, § 3332(4). The drug user will deliver those two forms to the pharmacist who, upon filling the prescription, shall endorse the original and copy with the date of delivery, the pharmacist's registration number and his signature, § 3333(3). The original of the form will be retained by the pharmacist for five years and the copy must be filed with the Department of Health by the fifteenth day of the month following the

month in which the drug was dispensed, § 3333(4).

The confidentiality of the records collected pursuant to the above procedures is protected as provided for in the statute, § 3371. That section states:

1. No person, who has knowledge by virtue of his office of the identity of a particular patient or research subject, a manufacturing process, a trade secret or a formula shall disclose such knowledge, or any report or record thereof, except:

(a) to another person who by virtue of his office is entitled to obtain such information; or

(b) pursuant to judicial subpoena or court order in a criminal investigation or proceeding; or

(c) to an agency, department of government, or official board authorized to regulate, license or otherwise supervise a person who is authorized by this article to deal in controlled substances, or in the course of any investigation or proceeding by or before such agency, department or board; or

(d) to a central registry established pursuant to this article.[4]

2. In the course of any proceeding where such information is disclosed, except when necessary to effectuate the rights of a party to the proceed-

---

4. The statute requires that addict maintenance programs be approved by the Commissioner, § 3352, pursuant to specific statutory standards, § 3353. Such programs are required to maintain certain records pertaining to addicts who are either in or have applied for admission to the program, § 3354 and the program must file monthly reports with the Department summarizing its activity in the preceding month, § 3355. The Department is required to maintain a "central registry" which, by drawing from the reports submitted pursuant to § 3355 and § 3372 (requiring individual physicians to report the name and other identifying information of any person found to be an addict), will be a centralized repository of information pertaining to the status of addicts and applicants for admission to maintenance programs, § 3356. That section provides:

1. The department shall establish or cause to be established a central registry

as part of which the following information shall be assembled:

(a) the name and other identifying data relating to each reported addict;

(b) the status of each addict awaiting admission to an approved program or programs;

(c) the status of each addict in an approved program.

2. Identifying data in such registry with respect to an individual addict shall be available only to:

(a) a practitioner attempting to ascertain the status of an addict seeking treatment with him or admission to a program with which he is associated;

(b) an agency, department of government, or commission established pursuant to the mental hygiene law and authorized to gather such information.

ing, the court or presiding officer shall take such action as is necessary to insure that such information, or record or report of such information is not made public.

Pursuant to its statutory authority, the Department of Health has promulgated regulations in respect of confidentiality as follows:

No person who by virtue of his office has knowledge of any records required by article 33 of the Public Health Law or this Part shall disclose such knowledge, or any report or record thereof, except:

(a) to another person who by virtue of his office is entitled to obtain such information;

(b) pursuant to judicial subpoena or court order in a criminal investigation or proceedings; or

(c) to an agency, department of government, or official board authorized to regulate, license or otherwise supervise a person who is authorized by this article to deal in controlled substances, or in the course of any investigation or proceeding by or before such agency, department or board. 10 N.Y.C.R.R. § 80.107 [5]

## The Issue to be Decided:

Although the Act does not specifically so provide, it is alleged by plaintiffs and conceded by the state, that the Department of Health will, upon receipt of the prescription forms, enter the information received into a computer. This anticipated procedure is the focus of plaintiffs' complaint.

■ The original plaintiffs in this action include three infants (by their parents) and one adult receiving Schedule II drugs, two named doctors who prescribe such drugs, and the Empire State Physicians Guild, Inc.[6] The plaintiffs complain of a violation of their constitutionally protected rights, 42 U.S.C. § 1983 and assert that the jurisdiction of the court is founded upon 28 U.S.C. § 1343(3). They allege that the reporting provisions of the Act

by requiring disclosure of the identity of certain patients . . . invades the patient's right of privacy and confidentiality, infringes on the doctor's right to prescribe treatment for his patients solely on the basis of medical considerations and discriminates against persons suffering from certain diseases by requiring their iden-

---

5. The Attorney General has informed the court that in response to the Court of Appeals decision in this case, discussed below, these regulations were amended to read as follows:

No person who has knowledge by virtue of his office of the identity of a particular patient or research subject, a manufacturing process, a trade secret or a formula shall disclose such knowledge, or any report or record thereof, except:

(a) to another person who by virtue of his office as an employee of the department is entitled to obtain such information; or

* * * * *

(d) to a central registry established pursuant to this article.

The Act authorizes the Commissioner of Health to promulgate regulations thereunder provided that a 21-day period is allowed for public response, § 3308. Furthermore, New York law requires that a copy of any proposed regulation must be submitted to the legislature at least 21 days before its adoption. N.Y. Executive Law § 101–a (McKinney's Consol.Laws, c. 18, 1972). Immediately after adoption by the Department the regulation

must be sent to the Secretary of State for inclusion in the official compilation of rules and regulations. N.Y. Executive Law § 102 (McKinney 1972). We have been advised that the new confidentiality regulation was submitted to the legislature in early June, 1973, and was formally promulgated by the Department of Health on July 2, 1973, effective upon filing with the Department of State.

6. The physicians are not here merely asserting the rights of their patients but claim independent violation of protected constitutional rights. Their standing to sue is established by Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). See also, Roe v. Ingraham, 480 F.2d 102, (2d Cir. 1973) at n. 5. Although it is unclear from the complaint, the Physicians Guild is apparently suing on behalf of its doctor members. Inasmuch as its claims are only repetitive, we may assume proper standing exists. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

tification to a governmental agency as a condition to receiving medical treatment for their illness. Complaint, Para. 11.

Shortly after the commencement of the action a postoperative cancer patient and an individual suffering from migraine headaches, both of whom receive Schedule II drugs as medication, the physician prescribing such drugs for one of these patients, and the American Federation of Physicians intervened and filed a separate complaint.[7] The intervenor plaintiffs repeat verbatim the language of the original complaint (quoted above) alleging that the Act is constitutionally infirm. In addition, the intervenors claim that the Act

> on its face, conflicts with, is inconsistent with and overlaps federal law and federal regulation and is thus void, being in conflict with the commerce power of the United States government and the laws and regulations enacted by the United States pursuant thereto. Complaint, Para. 13.

Both complaints, in identical language, ask for preliminary and permanent injunctive relief and the determination of these issues by a three-judge court pursuant to 28 U.S.C. § 2281.

*Prior Court Proceedings:*

By Order to Show Cause filed on March 29, 1973, the same date as the filing of the complaint, plaintiffs requested a temporary restraining order enjoining the implementation of the Act which was to become effective on April 1, 1973.

The District Court, after hearing all counsel in chambers, and based upon a number of supporting affidavits and their exhibits, issued a temporary restraining order enjoining the defendant from filing or processing any prescription forms containing a patient's name, from requiring physicians or pharmacists to file such prescription forms with the Department, and requiring placing under seal any form received until dissolution of the order.[8]

On April 6, 1973, the district court heard oral argument on plaintiffs' motion to convene a three-judge court and defendant's motion, made on April 3, 1973, to dismiss the action. The court, D.C., 357 F.Supp. 1217, dismissed for lack of a substantial federal question

---

7. All of the patient-plaintiffs—the three children and adult of the original complaint and the intervenor cancer patient and migraine sufferer—are identified in each complaint only by fictitious names ostensibly to protect their identities. This procedure is not explicitly authorized by the federal rules. However, it was given implicit recognition by the United States Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). The inherent problems which this procedure poses, most notably the possible inability to fix *res judicata* effect, mandate that it be used sparingly. Here, however, if plaintiffs are required to reveal their identity prior to the adjudication on the merits of their privacy claim, they will already have sustained the injury which by this litigation they seek to avoid. See N.A.A.C.P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Under such circumstances it is permissible to proceed by pseudonym but only if these fictitious names are actually representative of real and specific aggrieved individuals. Plaintiffs' attorneys have represented to the court that these preconditions have been met.

8. The order provided that it be:
ORDERED, that, pursuant to 28 U.S.C. Section 2284(3) and Fed.R.Civ.P.R. 65, pending determination of plaintiffs' application for a preliminary injunction, defendant Hollis S. Ingraham, his agents, servants and employees, be and they hereby are restrained from

(a) accepting for filing or processing New York State prescription forms containing the identity of patients receiving prescriptions for Schedule II controlled substances as set forth in Section 3306 of Article 33 of the Act; and

(b) requiring physicians or pharmacists to file prescription forms containing the identity of patients receiving prescriptions for Schedule II controlled substances as set forth in Section 3306 of Article 33 of the Act; and

it is further ORDERED that defendant, his agents, servants and employees shall retain in a sealed vault or other equally secure place any prescription forms received by them during the pendency of this temporary restraining order.

both in respect of the claim of denial of equal protection and infringement of plaintiffs' right of privacy.[9]

The Court of Appeals reversed the order of dismissal. Roe v. Ingraham, 480 F.2d 102 (2d Cir. 1973). While agreeing that plaintiffs' equal protection claims were properly dismissed, the court concluded that "the question whether the right of privacy here asserted by the patients does enjoy some degree of constitutional protection is a substantial one." *Id.* at 108. Assuming that right extended to the circumstances of this case, the district court would be required to determine whether its invasion was justified. Such a determination would require a factual investigation of the "need for central filing including the patients' names on the one hand and the adequacy of the provisions to protect against malicious or careless disclosure on the other." *Id.* at 109. For these reasons the Court of Appeals directed the district judge to request the convening of a three-judge court to make such a determination.

■ In stating that the plaintiffs' claim was "substantial" the Court of Appeals used that word as applied to the power of a single judge to dismiss a complaint seeking an injunction against an allegedly unconstitutional state law. Its decision means only that the complaints are "substantial" in that they are not "essentially fictitious", "wholly insubstantial", "obviously frivolous". Goosby v. Osser, 409 U.S. 512, 516, 93 S.Ct. 854, 858, 35 L.Ed.2d 36 (1973) (citations omitted). Whether the complaints are sufficiently substantial to defeat a motion to dismiss and whether plaintiffs are entitled to a preliminary injunction upon the determination of a statutory court of three judges, are wholly different problems.

## II

### Hearing Before This Court:

On remand, this statutory court was convened, as provided by 28 U.S.C. § 2281, and on June 25, 1973 heard oral argument on the plaintiffs' motion for a preliminary injunction and defendant's motion to dismiss.

### Preliminary Injunction:

■ In order to prevail on a motion for preliminary injunctive relief, the *moving party must demonstrate a clear showing of probable success on the merits and the possibility of irreparable injury.* Gulf & Western Industries, Inc v Great Atlantic & Pacific Tea Co., Inc., 476 F.2d 687 (2d Cir. 1973). However, "where the balance of hardship tips decidedly toward the party requesting the temporary relief", Dino De Laurentiis Cinematograficia S.p.A. v. D–150, Inc., 366 F.2d 373, 375 (2d Cir. 1966), the burden of demonstrating probable success on the merits is reduced *if* the moving party "has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation." Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.) cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969), *accord* Exxon Corp. v. City of New York, 480 F.2d 460 (2d Cir. 1973), Gulf & Western Indus. Inc. v. Great Atlantic & Pacific Tea Co., Inc., *supra.*

In order to determine the extent to which plaintiffs' claims measure up to these standards it is obviously necessary to consider, in some depth, the substantive content of the right of privacy.[10]

9. The trial court continued the temporary restraining order for three days to permit plaintiffs an opportunity to seek a further stay from the Court of Appeals. That court continued the order only insofar as it required the Commissioner to seal the prescription forms he receives pending appeal. Thus, doctors and pharmacists were required to perform all of their obligations under the Act.

This modified order was continued by the three-judge court and remains in effect at this time.

10. In their briefs and on oral argument before the three-judge court plaintiffs abandoned the equal protection claim which they had pressed in the earlier proceedings, and that issue, therefore, is no longer a question in this litigation.

## The Right of Privacy:

The plaintiffs assert that the state's systematic collection of all prescriptions for Schedule II drugs, which by statutory command must contain the patient's name, and the subsequent computerization of this information, violate their constitutionally protected right of privacy. While the Constitution does not specifically proclaim any general right of privacy, certain provisions of the Bill of Rights have been held to confer a guarantee of privacy. As early as 1885 the United States Supreme Court recognized that the Fourth and Fifth Amendments insure "the sanctity of a man's home and the privacies of life." Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1885). Yet, for many years the Court would not go beyond the specific strictures of the Constitution to protect individual privacy.[11]

In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) in which an electronic listening device was attached to the outside of a telephone booth, the Court abandoned the trespass concept of Fourth Amendment violation and chose instead to protect "the privacy upon which [the individual] justifiably relied." Id. at 353, 88 S. Ct. at 512. Even here, however, the protection of an aspect of individual privacy derived not from any general, unspecified rights, but rather, from a specific provision of a guaranteed freedom.

The First Amendment has also been interpreted to encompass certain privacies necessarily included within the scope of its specific mandates. Thus, in NAACP v. Alabama, 357 U.S. 449, 78 S. Ct. 1163, 2 L.Ed.2d 1488 (1958) the Court, in protecting the integrity of the membership lists of a private organization, recognized the "freedom to associate and privacy in one's associations," id. at 462, 78 S.Ct. at 1172, which emanates from the guarantees of speech and assembly. Watkins v. United States,

354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957), in limiting the scope of congressional committee questioning of individuals, made note of the need "to insure that the Congress does not unjustifiably encroach upon an individual's right to privacy nor abridge his liberty of speech, press, religion or assembly." Id. at 198–199, 77 S.Ct. at 1185. Similarly, the First Amendment has been held to include a correlative right to receive information and ideas. Thus, the attempt to criminalize the mere private possession of obscene material was found to be unconstitutional. Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

These rights of privacy discussed above are only examples of the protection afforded pursuant to specific provisions of the Bill of Rights. The plaintiffs here, however, do not contend their claim is derived from any particular section of the Constitution. Rather, they assert an independent right of privacy first given cognizance by the United States Supreme Court in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Although sharply divided over the exact origins of such a right, a majority of the Court recognized the existence of a constitutionally protected "zone of privacy" which shielded the individual from unreasonable personal intrusions by federal or state governments. This principle has been reasserted in a number of subsequent cases. See, e. g., Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Each of these cases involved instances of sexual conduct, and as recently noted in this Circuit, "the right to privacy which thus far has been granted constitutional protection relates only to 'the most intimate phases of personal life' having to do with sexual intercourse and its possi-

---

11. See, e. g., Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 729 (1928), in which the Court concluded that wiretapping is not a "search" within the meaning of the Fourth Amendment. Ultimately, the limitations imposed by Olmstead were lightened.

ble consequences. . . ." Roe v. Ingraham, *supra* 480 F.2d at 107, quoting Rosenberg v. Martin, 478 F.2d 520, 524, (2d Cir. 1973).

Plaintiffs' claims, therefore, raise novel and serious questions with potentially far-reaching consequences as to the permissible reach of the protection afforded by the right of privacy as an independent constitutional guarantee. In order to decide the motion before us, however, we need not, at this time, fully define the limits of that right.

Plaintiffs have conceded the constitutionality of the New York law as it existed prior to the effective date of the Controlled Substances Act. Pursuant to the provisions of that now repealed statute—the Narcotic Drug Control Act, New York Laws 1953, ch. 879, §§ 3300–3366, as amended—all prescriptions were required to bear the patient's name, New York Laws 1961, ch. 206, § 3301(32), the pharmacist dispensing the prescribed drug had to retain the prescription in his file for a period of two years, New York Laws 1953, ch. 879, § 3322, subd. 1(c), and the pharmacist's files had to be maintained "so as to be readily accessible for inspection by any public officer or employee engaged in the enforcement of this article." *Id.*[12]

It is evident, therefore, that the nature of the information required to be revealed by individual legitimate drug users remains essentially the same. Under the old law, however, the accumulation of records began and ended with the individual pharmacist, without any attempt at centralization. Now, of course, although the prescription information remains the same, the data is transmitted to a single data-collection facility. Plaintiffs' complaints, therefore, go only to this centralized collection of information ("record-keeping") rather than to the nature of the information obtained in the first place ("reporting").

This essential distinction between reporting and record-keeping in respect of infringement of constitutional proscriptions was most recently noted in Stark v. Connally, 347 F.Supp. 1242 (N.D.Cal. 1972), appeal pending 41 L.W. 3509 (1973). In that case the plaintiffs challenged the provisions of the Bank Secrecy Act, 31 U.S.C. §§ 1051–1122. The record-keeping provisions of the statute required banks to keep the customary ledger records of individual accounts and microfilm copies of all checks, drafts or other instruments drawn on, presented for payment to, or received for deposit by the bank. The reporting provisions gave the Secretary of the Treasury virtually unlimited power to require the reporting of all business and individual financial transactions, regardless of size.

It was only as to the *reporting* provisions relating to domestic transactions that the court found the statute transgressed constitutional guarantees of privacy, and then only because of the particularly broad discretion given to the Secretary to require submission of information about all aspects of every financial transaction. Thus, *Stark* would support plaintiffs' position here only if the New York State Commissioner of Health had been given broad powers to delve into intimate details of the individual's medical history. In fact, the extent of the reporting provisions, namely, the insertion of the patient's and doctor's names on a prescription, are here not deemed offensive, and thus *Stark* supports defendant's contention that the Act does not unconstitutionally encroach upon plaintiffs' right of privacy.

Equally important for the defendant is Thom v. New York Stock Exchange, 306 F.Supp. 1002 (S.D.N.Y.1969), affd. 425 F.2d 1074 (2d Cir.), cert. denied 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). There plaintiff challenged a New York law requiring all persons employed by member firms of national se-

---

12. See, also, New York Laws 1953, ch. 879, § 3334 which permitted access to the files by

United States officials in regard to enforcement of the federal drug laws.

curity exchanges to be fingerprinted as a condition of employment, N.Y. General Bus.Law § 359–e(12) (McKinney's Consol.Laws, c. 20, Supp.1972), claiming that the statute was, *inter alia,* an unconstitutional invasion of his right to privacy. The court noted that the plaintiff did not contest the state's right to investigate employees of national security firms but only objected to being fingerprinted.

> But fingerprinting under the statute is only a means of verifying the required information as to the existence or nonexistence of a prior criminal record. It involves no additional intrusion into the personal lives of the employees and applicants. The submission of one's fingerprints is no more an invasion of privacy than the submission of one's photograph or signature to a prospective employer, which the Stock Exchange rules still require. *Id.* at 1009 (Footnote omitted.)

■ *Thom* emphasizes once again the underlying fallacy of plaintiffs' argument. Any invasion of privacy which occurs under this statute would appear to result from the original insertion of a patient's name on the prescription and its delivery to the pharmacist rather than the subsequent centralized collection of these documents. Furthermore, the plaintiffs have been unable to produce any evidence, either by affidavit, scientific study, official document or otherwise, which provides even the slightest hint of actual, or even likely, injury which will result to the plaintiffs if the drug reporting system becomes operational.[13] Indeed, the Memorandum of Assemblyman Chester Hardt, Chairman of the Temporary State Commission to Evaluate the Drug Laws, to Members of the Legislature, which was submitted as an exhibit to *plaintiffs'* moving papers, reflects favorably on defendant's position. This memorandum, along with the Interim Report and the affidavit of Dr. Robert Whalen, Second Deputy Commissioner of the New York State Department of Health, all demonstrate 1) that the state perceives itself to be in the throes of a crisis situation resulting from the rampant illegal use of drugs; 2) that the diversion of legal drugs to illicit use is a substantial contributing factor in this dangerous situation; 3) that the responsible state officials have engaged in serious, protracted and extensive study and research, including the solicitation of advice and recommendations from various representatives of special interest groups and the public

---

13. The plaintiffs argue that the very act of coding a patient's name into a centralized computer would result in the unwarranted invasion of a constitutionally protected right to privacy. At oral argument this proposition was supported primarily by counsel's reference to the general threat of privacy posed by ever-increasing capacity of data-collection systems and computer informational transfer on the one hand, and the more specific harm flowing to particular individuals consequent to the perpetuation of incorrect data and the unauthorized divulgence of private information.

Plaintiffs' fears are shared by many and have within the last few years generated considerable literature. The seminal work is Westin, "Privacy and Freedom" (1967) in which the author, as Chairman of the Special Committee on Science and Law of The Association of the Bar of the City of New York, first defined privacy as "the claim of individuals, groups, or institutions to determine for themselves when, how, and to what extent information about them is communi-

cated to others." *Id.* at 7. After examining the "new tools for invading privacy" he concludes that the governing institutions of our society have been remiss in maintaining the balance of privacy in this country and that without immediate action we are threatened with subjugation to the tools of science. Interestingly enough, Westin, five years later, has co-authored, as Project Director of the Project on Computer Databanks of the Computer Science and Engineering Board of the National Academy of Sciences, the only thorough study of the actual manner in which operating computer systems have influenced individual privacy. Westin and Baker, "Databanks in the Free Society: Computers, Record-Keeping and Privacy" (1972). This study, like its predecessor, does not make light of the awesome capabilities of the computers. Yet, it concludes that: "Our finding is that [the earlier prediction that computers would destroy practical boundaries of privacy] does not fit the computerized record systems in existence in 1970–72." *Id.* at 243.

at large, all of which resulted in the proposed legislation; and 4) that the methods ultimately decided upon appear on their face to be reasonably calculated to effectuate the purposes for which they were established, namely, to effectively monitor the ebb and flow of the legal drug trade so as to identify sources and methods of diversion.[14]

■ The constitutional right of privacy, obviously, is not an absolute bar to all government action that intrudes into one's personal life. The critical question is whether the objective which the regulation seeks to accomplish is necessitated by a subordinating state interest justifying the degree and consequences of the resulting personal intrusion. See, e. g., Roe v. Wade, supra, 410 U.S. at 153, 93 S.Ct. at 727; Roe v. Ingraham, supra 480 F.2d at 108. In seeking a preliminary injunction the burden is on the plaintiffs to demonstrate a probability of success or at least the existence of a serious and substantial question warranting further deliberation. Robert W. Stark, Inc. v. New York Stock Exchange, 466 F.2d 743, 744 (2d Cir. 1972), Inmates of Attica v. Rockefeller, 453 F.2d 12 (2d Cir. 1971).

■ In order to obtain preliminary injunctive relief, the plaintiffs are bound to show, at the very least, a substantial legal foundation for their claim that the reporting provisions of the statute violate their right of privacy *and* that the consequences of the resulting intrusions are not justified when considered against the state's interest. However, the plaintiffs have not produced any evidence which demonstrates conclusively, or even supports inferentially, the conclusion that, assuming the right to privacy will be extended to cover this case, the competing interests of the state are not sufficient to overcome whatever injury they may suffer. It is this lack of proof which, at this stage of the proceedings, causes plaintiffs' success on the merits to be insufficiently probable and their claim to be decidedly insubstantial.

Having reached this conclusion, it is not necessary to decide the question of irreparable injury or tipping of the balance of hardships. It should be noted, however, that the state's efforts are directed against a very real and pressing emergency requiring immediate and effective response. The injury to the state and its people resulting from any delay in implementation of programs designed to deal with this problem may be quite significant. On the other hand, there is no evidence of any immediate injury threatening the plaintiffs other than the computerization of their names at the Department of Health and even this injury is easily susceptible to remedy, should the plaintiffs ultimately prevail, merely by ordering the state to destroy its records and erase the tapes.

*Motion to Dismiss:*

■ The defendant's motion to dismiss, subject as it is to the most favorable reading of plaintiffs' complaint, cannot be sustained. The discussion above demonstrates only that at this time the plaintiffs have not met the heavy burden required to convince this court of the propriety of a preliminary injunction. On the other hand, the plaintiffs ought to be allowed to explore more fully the outer reaches of the right to privacy itself and to submit the necessary intensive and detailed analysis of the competing interests of the state and the individual. Specifically, the plaintiffs must be afforded the opportunity to demonstrate that the computerization of names is not necessary for the accomplishment of the state's goals, that the controls developed by the state are inadequate to protect against unauthorized

14. Plaintifs argue that other states have adopted less restrictive legislation which does not require the centralized collection of patients' names. The validity of the New York law is not undercut by the existence of different laws elsewhere, particularly when the enactment of the instant statute was preceded by extensive research and study which demonstrates the state's attempt to construct a statutory scheme responsive to local needs.

disclosure of the computerized information and that the injury to the plaintiffs resulting from the implementation of this system of centralized filing is sufficiently serious to overcome any competing state interest.

The motion to dismiss is denied. The motion for preliminary injunction is denied and the restraining order heretofore entered is vacated.

So ordered.