Richard ROE, an infant by Robert Roe,
his parent, et al., Plaintiffs,

v.

Hollis S. INGRAHAM, as Commissioner
of the State of New York Health
Department, Defendant,

George Patient et al., Intervenors.

Nos. 73 Civ. 1303, 73 Civ. 1431.

United States District Court,
S. D. New York.

Aug. 13, 1975.

Probable Jurisdiction Noted Feb. 23, 1976.
See 96 S.Ct. 1100.

Shea, Gould, Climenko & Kramer, New York City, by Michael Lesch, Barry L. Mendelson, New York City, for plaintiffs in 73 Civ. 1303.

Solomon Z. Ferziger, David P. Steinman, New York City, for plaintiffs.

Norwick Raggio & Jaffe, New York City, by H. Miles Jaffe, New York City, Legal Action Center of the City of New York, Inc., New York City, by Elizabeth B. DuBois, Eric D. Balber, Margaret K. Brooks, Risa G. Dickstein, New York City, co-counsel for plaintiff Patient in 73 Civ. 1431.

Louis J. Lefkowitz, Atty. Gen. of New York, New York City, by Michael Fogarty, Seth Greenwald, Asst. Atty. Gen., New York City, for defendant.

Before FEINBERG, Circuit Judge, and WYATT and CARTER, District Judges.

## OPINION

ROBERT L. CARTER, District Judge.

*Status of Proceedings*

This challenge to the constitutional validity of the New York Public Health Law, McKinney's Consol.Laws, c. 45, § 3300 et seq., pursuant to which under §§ 3331(6), 3332, subd. 2(a) and 3334(4) all prescriptions containing Schedule II substances must be filed with the Bureau of Controlled Substances, Licensing and Evaluation (BCSLE) in Albany on forms supplied by the state is before us on the merits. Plaintiffs seek to enjoin permanently so much of the statutory provisions under attack as require that the names of recipients of Schedule II drugs prescribed by licensed physicians as medications be filed with the state for computerization.

Since the history of the litigation has been set out in our prior opinion, reported at 364 F.Supp. 536, where we denied plaintiffs' motion for a preliminary injunction and defendant's motion to dismiss, we will advert only briefly to the background facts. In 1970 a Temporary New York State Commission to Evaluate the Drugs Laws was created. Its function was to recommend whatever modifications in the law were deemed necessary to meet existing problems in respect of drug abuse. In the Commission's Interim Report drugs were grouped into five schedules. Schedule II drugs (which are the concern of this litigation) recognizably have legitimate and worthwhile uses in the treatment of illnesses and disorders. (*Id.* at P. 13). Among the Schedule II drugs in this

category are, e. g., ritalin, codeine, percodan, morphine and hycodan. These drugs are useful in ameliorating pain, in the treatment of epilepsy, narcolepsy, hyperkinesia, schizoaffective disorders, and migraine headaches, but they also have a high potential for abuse. The legislation before us seeks to prohibit Schedule II legitimate drug medications from being diverted to illegal uses by governmental oversight of the prescription, distribution and use of these drugs.

In our prior opinion we said that "[p]laintiffs' claims . . . raise novel and serious questions with potentially far-reaching consequences as to the permissible reach of the protection afforded by the right of privacy as an independent constitutional guarantee," 364 F.Supp. at 544, and in refusing to dismiss the action we stated that "plaintiffs must be afforded the opportunity to demonstrate that the computerization of names is not necessary for the accomplishment of the state's goals, that the controls developed by the state are inadequate to protect against unauthorized disclosure of the computerized information and that the injury to the plaintiffs resulting from the implementation of this system of centralized filing is sufficiently serious to overcome any competing state interest." *Id.* at 546–547.

*Findings of Fact*

The evidentiary facts relevant to decision on the merits were presented to us in four forms (1) by stipulated facts, (2) depositions taken on December 4 and 6, 1974, (3) exhibits, and (4) live testimony before the court on December 2, 1974. What follows are our findings of fact.

Special prescription forms are required for all Schedule II drugs, and such forms are sent to all qualified physicians who order them. The forms are serially numbered. A letter from the Commissioner of Health instructs physicians on how to secure and obtain the forms, and lists some of the Schedule II drugs and their trade names. A physician dispensing a Schedule II drug is required to keep one copy of the prescription and to mail the original and other copy to the BCSLE in Albany. When the physician prescribes but does not dispense the drug himself, he is again required to keep one copy of the form, but gives the original and remaining copy to the patient, who takes them to a pharmacist in order to have the prescription filled. The pharmacist keeps the original and sends the copy to the BCSLE. The prescription form contains the name, address, telephone number and DEA [1] (Drug Enforcement Administration) number of the prescribing physician, the date the prescription was issued, the name, age and address of the patient, the name and amount of the drug prescribed, maximum daily dosage, the signature of the physician, the prescription number issued by the pharmacy, the date the prescription was filled, the NDC (National Drug Code) number of the drug, the DEA number of the pharmacy, and the signature of the dispenser.

The prescription forms are received in the mail room of BCSLE in Albany. Since April 1, 1973, the effective date of the Act, BCSLE has been receiving approximately 100,000 prescription forms per month. The forms are taken unopened to a receiving room where they are opened, coded, put into batches of 100 each and logged. These tasks are performed by approximately nine clerks. The batches are then taken into a "processing room" which is a part of the Office of Electronic Data Processing (OEDP). There the information on the forms is key punched onto a recorder disc and after the disc is filled, the information is put on magnetic tapes, and the disc is erased. The magnetic tapes are kept in drawers of a locked cabinet, but while the information is on the disc recorder, it is not kept under lock.

---

1. DEA was formerly the Bureau of Narcotics and Dangerous Drugs (BNDD).

Dr. Arthur G. Baker, Associate Commissioner of Health for Community Health Services, has overall responsibility for the Schedule II prescription program. The BCSLE and the Bureau of Narcotic Control (BNC) are under his jurisdiction. BNC, directed by John J. Bellizzi, is empowered to investigate violations of the Public Health law and of Schedule II regulations. There are 14 BNC investigators in New York City and two each in Buffalo, Rochester, Syracuse, White Plains and Albany. Joseph L. Cannizzaro is the BCSLE director, and his agency, in addition to processing, has responsibility for the retention and security of the forms. OEDP, headed by Joseph Bonacci, though a part of the Dept. of Health, apparently is not under Dr. Baker's jurisdiction but is responsible for processing the information contained on the forms onto computers. Approximately thirty-one employees of the Dept. of Health have access to all computerized information developed through the program.

As of the December, 1974, date of the trial, the program had then been in effective operation for roughly twenty months. The evidence presented by the state discloses that the computerized information is helpful in facilitating the study of the number of prescriptions filled per month by the average physician, and the number dispensed by the pharmacist; it aids in detecting instances of over-prescribing and over-dispensing, in detecting forgeries and counterfeit prescriptions. Thus far the uses derived from having the individual recipient's identity revealed were reported to be: (1) identifying those persons who using their own name go from doctor to doctor to obtain an illicit supply of drugs and (2) uncovering those receiving more than a 30-day supply of Schedule II drugs per month. Two such names have been discovered since the computerized program has been in operation. Both were referred to the BNC for investigation. In one case, the investigation disclosed a bona fide doctor-

patient relationship, and in the other the investigation was still open when all evidentiary data was submitted for our consideration.

Testimony was presented by Joseph Jules Wasserman, who specializes in auditing the security and controls of computer systems, the burden of which was to demonstrate the weaknesses in the security system at the BCSLE and OEDP in the processing, computerizing and storing of the information on the prescription forms. Dr. Jerry Martin Rosenberg, a psychologist, testified that the program had an adverse effect in respect of the doctor-patient relationship and would dissuade individuals who might need Schedule II drugs from undergoing required treatment.

At the hearing before us Michael Moe and Mary Doe expressed concern that their children, who are being treated with ritalin for hyperkinesia, will be stigmatized because the state will have a long file on their children in a narcotics and dangerous drug context. Mrs. Doe testified that she has taken her child off ritalin; the child is not doing well without the medication, but the alternative she feels is to have him branded for life. Jane Poe testified that she had had encephalitis followed by complications resulting in the loss of all control of the eyes so that they move uncontrollably in one direction or the other—an affliction called the oculogyric crisis. When she learned that under the new regulation her name was to go on a computer because the amphetamine with which her condition was treated was a Schedule II drug, she believed she would be labeled a drug addict.

Martha Patient, who suffers from migraine headaches, is treated by a medication containing fiorinal, codeine and cathedot. On learning that her name was to be reported to Albany and put on a computer when prescriptions for her medication were filled, she stopped the medication. Subsequently, however, her

headaches returned, and she was forced to resume treatment. She has no confidence that information once put on a computer will remain confidential. George Patient has cancer of the lungs and had three ribs removed. Percodan was prescribed for the pain. When he learned his name would go to Albany, he tried other kinds of medication which did not work. Later he learned that he could get the drug through his union from out of state, and he now follows that course.

Four doctors testified: Matthew Brody, who does not believe any ethical doctor can live with the law; Stanley Fishman, who testified to a belief that the law's requirement that patients be identified and their name recorded on a computer disc would have an adverse effect on the patient; Israel S. Schmierer, who expressed the view that the law entrenches upon the confidentiality of the patient-doctor relationship; and Gerald Lustig who refuses to prescribe any Schedule II drugs for his private patients. All testified that they felt obligated to advise their patients or a responsible member of their family about the state prescription program for Schedule II drugs, and reported a reaction of shock, fear and concern on the part of their patients on learning that their names would be sent to Albany and put on a computer.

*Determination*

The justification the state advances for the state prescription program, including identification of the patient being treated with a Schedule II drug, is the grave danger of abuse and consequential psychological dependence use of these drugs may cause. The issue is troublesome. The state seeks to deal with a well-recognized and prevalent evil —the wide-spread proliferation of drug abuse. In seeking through the legislation before us to prevent the diversion of Schedule II drugs to illegal use, the state manifestly is performing a legitimate governmental function. On the other hand plaintiffs assert that the statute in infringing upon the doctor-patient relationship intrudes on one of the zones of privacy accorded constitutional protection. If the plaintiffs' claims have validity, they are asserting rights which are at the core of "those liberties of the individual which history has attested as the indispensable conditions of an open as against a closed society [and those claims, therefore, are entitled to] respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements." *Kovacs v. Cooper*, 336 U.S. 77, 89, 95, 69 S.Ct. 448, 458, 93 L.Ed. 513 (1949) (Frankfurter, J. concurring). *See also Griswold v. Connecticut*, 381 U.S. 479, 482–485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Id.* at 486, 487–497, 85 S.Ct. 1678 (Goldberg, J., concurring); *Id.* at 502, 503, 85 S.Ct. 1678 (White, J., concurring).

■■ Although the focus on privacy as a separate and distinct guarantee is of recent origin, *see Griswold v. Connecticut, supra; Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), Justice Blackmun, speaking for a majority of the Court, traced the right of privacy to "a line of decisions . . . going back perhaps as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891) [that] has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy" are given constitutional protection. *Roe v. Wade, supra*, 410 U.S. at 152, 93 S.Ct. at 726. It was pointed out that the right of privacy had been said to rest on the First Amendment, *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); the Fourth and Fifth Amendments, *Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Katz v. United States*, 389 U.S. 347, 350, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); the

penumbras of the Bill of Rights, *Griswold v. Connecticut, supra,* 405 U.S. at 484–485, 85 S.Ct. 1678; on the Ninth Amendment, *Id.* at 486, 85 S.Ct. 1678 (Goldberg, J. concurring), and on the concept of liberty guaranteed by the Fourteenth Amendment, *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). *Ibid.* Only those rights basic to a free society or which are encapsulated within the concept of ordered liberty are included in the constitutional guarantee of privacy. Cited in precedential support for the conclusion that the right of privacy is of constitutional dimensions were *Eisenstadt v. Baird, supra,* 405 U.S. at 453, 454, 92 S.Ct. 1029; *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Skinner v. Oklahoma,* 316 U.S. 535, 541–542, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), and *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The short description of each of these cases gives an expanded reading of the zone of privacy protected. *Id.* 410 U.S. at 152–153, 93 S.Ct. 705.

By the very nature of our society which distinguishes the spiritual from the profane, church from state, inherent and inalienable rights from those rights that government may give or withhold, *a fortiori* a concept of privacy must inevitably emerge. Konvitz, *Privacy and the Law: A Philosophical Prelude,* 31 Law & Contemp.Prob. 272, 273 (1966). The concept of privacy is an affirmation of the importance of certain aspects of the individual and his desired freedom from needless outside interference. It is sometimes described as a sphere of space that a man may carry with him which is protected from unwarranted outside intrusion, as the right of selected disclosures about oneself and as a right of personal autonomy. Hen-

kin, *Privacy and Autonomy,* 74 Colum. L.Rev. 1410 (1974). Konvitz, *supra.*

"[I]t is apparent [therefore] *that* the right of privacy is constitutionally protected. It is the *when* and *how* which create the problems." *Roberts v. Clement,* 252 F.Supp. 835, 845, 848 (E. D.Tenn.1966) (Darr, J. concurring) (emphasis in the original); Kauper, *Penumbras, Peripheries, Emanations, Things Fundamental and Things Forgotten: The Griswold Case,* 64 Mich.L. Rev. 235 (1965); Parker, *A Definition of Privacy,* 27 Rut.L.Rev. 275 (1974); Gross, *The Concept of Privacy,* 42 NYU L.Rev. 34 (1967); Note, 26 Stan.L.Rev. 1161 (1974); Note, 48 NYU L.Rev. 670 (1973). Our task, however, has been simplified since we read *Roe v. Wade* as holding implicitly and *Doe v. Bolton,* 410 U.S. at 197, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), as holding explicitly that the doctor-patient relationship is one of the zones of privacy accorded constitutional protection. Justice Douglas has described the expectation of privacy in the doctor-patient relationship as being exceeded only by that expectation in the relationship of a penitent to his priest. *Id.* at 219, 93 S.Ct. 739. *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S. Ct. 2628, 37 L.Ed.2d 446 (1973), reaffirmed the holding in *Roe* and *Doe* that privacy embraced the doctor-patient relationship. There it was said, at page 66, 93 S.Ct. at page 2640, note 13: "the constitutionally protected privacy of family, marriage, motherhood, procreation and child rearing is not just concerned with a particular place, but with a protected intimate relationship. Such protected privacy extends to the doctor's office, the hospital, the hotel room, or as otherwise required to safeguard the right to intimacy involved." While the doctor-patient relationship involved in *Roe* and *Doe* concerned the most intimate personal relationships, sexual relations and "whether to bear or beget a child," *Eisenstadt v. Baird, supra,* 405 U.S. at 453, 92 S.Ct. at 1038, and the right

of privacy has primarily focused on home and family, it would be too restricted a reading of precedent for us to hold that the physician-patient relationship here is not constitutionally protected merely because it does not concern medical advice or professional judgments concerning child bearing. *See Roe v. Ingraham,* 480 F.2d 102, 107 (2d Cir. 1973).

■ An individual's physicial ills and disabilities, the medication he takes, the frequency of his medical consultation are among the most sensitive of personal and psychological sensibilities. One does not normally expect to be required to have to reveal to a government source, at least in our society, these facets of one's life. Indeed, generally one is wont to feel that this is nobody's business but his doctor's and his pharmacist's. When these physical illnesses and disabilities require as here treatment by drugs which, in light of the current epidemic of drug abuse in the society, are under governmental control and regulation, there is legitimate concern that information that one, one's children or an intimate is under treatment with such drugs not be broadcast to unauthorized sources. There is fear that the adults or children will be stigmatized if their use of the drug becomes known. There is no question but that the statutory requirement challenged here intrudes upon and interferes with the doctor-patient relationship.

■ Even though the right of privacy which we find to exist in the doctor-patient relationship at issue in this case is constitutionally protected, it is equally clear that the right has limitations. When the state interest asserted is compelling, the right of privacy may be impinged upon, but "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which

sweep unnecessarily broadly and thereby invade the area of protected freedoms," *NAACP v. Alabama,* 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L. Ed.2d 125 (decided June 24, 1975); *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Cantwell v. Connecticut,* 310 U.S. 296, 304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); where fundamental rights are involved, "[p]recision of regulation must be the touchstone," *NAACP v. Button,* 371 U. S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963).

■ Concededly the state effort to control drug abuse and to prevent illicit trafficking in dangerous drugs fosters a legitimate state purpose, and ordinarily we would be reluctant to interfere. The regulatory scheme, however, has a needlessly broad sweep. The state prescription form program provides for issuing serially numbered prescription forms to physicians. Each doctor prescribing and each pharmacist dispensing any Schedule II drugs are given a DEA number. They, therefore, are readily identifiable. The state can promptly determine the quantity of drugs prescribed and dispensed by particular physicians and pharmacists. Over-prescribing or dispensing, forgeries and thefts can be detected. Having the name of the person receiving the drugs on the state's form adds nothing. Indeed, admittedly the only purpose this information serves is to identify individual patients who without using an alias go from doctor to doctor to secure Schedule II drugs and those individuals who secure more than a 30-day supply in any single month. During the 20 month life of the program only one such unresolved incident in this category had been unearthed. The diminution of a constitutionally guaranteed freedom is too great a price to pay for such a small governmental yield.[2]

---

2. There is no state claim that the names on the form will be of aid in preventing addicts from access to drugs by prescription. They, of course, would not use their own name or

**938**

The state argues that it is doing no more than it did under the old regulations when prescriptions with the patient's name were required to be kept by pharmacists for inspection. That argument must be rejected. The intrusion here is not only more immediate, its impact is greater. A name on a prescription in the files of one of many thousands of pharmacists in the state of New York is entirely different from one's name on a form in Albany which is transferred to computerized records and stored for instant retrieval.

We are reinforced in the belief that the right of privacy covers the situation of the doctor-patient relationship involved in this case by the Supreme Court's decision in another area. In *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), the concurring (*Id.* at 78, 94 S. Ct. 1494) and dissenting (*Id.* at 79, 91, 93, 94 S.Ct. 1494) opinions which secured adherence from a majority of the Court, made clear that if the regulations or the statute had been read as an unrestricted requirement that all bank transactions of whatever dimension be reported, the Bank Secrecy Act would have been held to have been an invalid intrusion upon the "legitimate expectations of privacy," of rank and file depositors. (Powell, J. concurring, 416 U.S. at 79, 94 S.Ct. 1494). What saved the act from condemnation was the view of Justices Powell and Blackmun that the restricted reach of the reporting requirement made the intrusion sufficiently discrete that it did not entrench unwarrantedly upon the zone of privacy.

Accordingly, we hold that so much of the New York Health Law as requires reporting to state authorities in

the same name in going from doctor to doctor. The doctors who testified before us all stated, without being controverted, that they could readily recognize an addict who came to their office seeking a drug by prescription, because they would ask for a specific

Albany the names and addresses of patients who receive Schedule II drugs as medication prescribed by duly licensed physicians is an unconstitutional interference with plaintiffs' rights of privacy guaranteed under the Fourteenth Amendment. The bases for our decision make unnecessary an evaluation of the operative state measures to insure confidentiality.

Settle order on notice.

drug and be vague about their illness and the name of their physician who had prescribed the medication initially. Moreover, the program is not designed to ferret out addicts in any case.