E. I. du PONT de NEMOURS AND COMPANY, a corporation, Petitioner,

v.

John F. FINKLEA, Director of the National Institute of Occupational Safety and Health, and Joseph A. Califano, Jr., Secretary of Health, Education and Welfare, Respondents.

Civ. A. No. 77–2059–CH.

United States District Court, S. D. West Virginia, Charleston Division.

Dec. 20, 1977.

George G. Guthrie, Spilman, Thomas, Battle & Klostermeyer, Charleston, W. Va., for petitioner.

John A. Field, III, U. S. Atty., Charleston, W. Va., for respondents.

## MEMORANDUM OPINION

KNAPP, Chief Judge.

Petitioner, E. I. du Pont de Nemours and Company (du Pont), commenced this declaratory judgment action pursuant to the provisions of 28 U.S.C. § 2201, *et seq.*, and Rule 57, Federal Rules of Civil Procedure, against respondents, John F. Finklea, Director of the National Institute for Occupational Safety and Health (NIOSH), and Joseph A. Califano, Secretary of Health, Education and Welfare (Secretary), asking this Court to declare certain subpoenas duces tecum served on du Pont by NIOSH invalid and unenforceable.

Certain facts relevant to this action have been stipulated to by the parties. Additional facts germane to the disposition of this action are not in serious dispute.

On May 26, 1976, du Pont was advised by representatives of NIOSH that NIOSH had been requested by an authorized representative of du Pont's employees to make a research investigation at du Pont's Belle, West Virginia, plant to determine whether any substance normally found at that plant had potentially toxic effects in such concentrations as used or found.

Prior to January 14, 1977, representatives of NIOSH, with the assistance and consent of du Pont, made several inspections at the Belle plant and interviewed numerous employees in connection with the research investigation. These inspections revealed that of the 147 different chemicals used or found at the Belle plant, 13 were suspected of being carcinogens. NIOSH thus concluded that an investigation should be conducted to determine whether there is a high incidence of cancer among the employees at the Belle plant, and if so, whether such incidence is job related.

On January 14, 1977, NIOSH, acting pursuant to the provisions of Section 8(b) of the Occupational Safety and Health Act (the Act), 29 U.S.C. § 657(b), issued to du Pont an administrative subpoena duces tecum requiring Fred Winterkamp, in his capacity as manager of the Belle plant, to produce in connection with the research in-

vestigation the medical and employee records of 34 named individuals, together with the medical and employee records of some 200 individuals whose names appeared on a list taken from du Pont's Tumor Registry, which list du Pont had furnished NIOSH on August 20, 1976.

On February 3, 1977, NIOSH, again acting pursuant to the provisions of 29 U.S.C. § 657(b), issued a second administrative subpoena duces tecum requiring Mr. Winterkamp to produce in connection with the investigation the personnel and medical records, including any death certificates, of all former and current employees of du Pont at the Belle plant. This subpoena was served on du Pont on February 7, 1977.

The relevancy of the information sought by NIOSH contained in the subpoenaed records is explained by Dr. Finklea in his affidavit of April 18, 1977, to-wit:

"11. The procedures for identifying causal factors in industrial disease differ. For dermatologic and most neurologic conditions, the interval between exposure and manifestation of disease symptoms is relatively brief. The disease process in cancer is lengthy, often approaching decades between exposure and diagnosis or death. Because of this difference, medical examinations of the current work force alone for possible cancers is inadequate for the research investigation at the Belle plant. The inadequacy of this approach to carcinogenesis is further complicated by changes in a given employer's work force resulting from either routine job mobility or the sensitivity of certain individuals to occupational exposures. Recent epidemiologic studies have demonstrated that it is often the terminated employees who are dying of cancer at even higher rates than the current work force. Therefore, to carry out an effective occupational health investigation in this case, it is necessary for NIOSH to conduct a methodologically correct study of the cancer incidence among not only present employees but also among all past employees of the du Pont Belle Plant.

12. To study the cancer incidence and evaluate the cancer risk in the workplace, it is first necessary to reconstruct as complete a list as possible for each individual who is or has ever been employed at Belle according to the individual's name, date of birth, social security number, employment dates, and job categories. NIOSH then would seek to determine the vital status of each individual and the cause of death in the case of deceased individuals and the health status of living individuals. Towards these ends, all employment and medical records of current and former Belle employees are relevant and necessary. A death certificate for each deceased employee would also be obtained and coded in accordance with standard disease classification procedures."

Dr. Finklea goes on to state that this information will assist NIOSH in determining whether a statistical basis is present to conclude that the rate of cancer among du Pont's past and present employees is job related.

Prior to the February 7, 1977, service of the second subpoena duces tecum, and apparently in anticipation thereof, du Pont on February 4, 1977, corresponded by letter with approximately 3,000 of its past and present Belle employees, requesting each to indicate on an enclosed waiver form whether or not that employee consented to the disclosure of his respective medical records. Of the employees who responded, 1,717 gave their consent to the proposed disclosure, while 631 refused.

Du Pont declined to comply with those portions of the subpoenas which would require du Pont to unilaterally disclose to NIOSH the medical records of the 631 past and present employees who refused to consent to such disclosure.

This action was therefore instituted on February 8, 1977, with the original petition asking this Court to declare whether du Pont was required to comply with the subpoenas duces tecum. The amended petition additionally asked the Court to declare that the subpoenas duces tecum were invalid and unenforceable.

824

This action is presently before the Court on cross-motions for summary judgment for a determination of the respective rights and duties of the opposing parties.

■ Read *in pari materia*, the provisions of 29 U.S.C. §§ 657 and 669 give to the Secretary, and accordingly NIOSH, the authority to issue the instant subpoenas duces tecum to procure from du Pont the records du Pont was requested to produce. When such authority exists, an administrative agency, including NIOSH, may seek enforcement of an administrative subpoena duces tecum in the district court. In the district court, enforcement may be sought if (1) the inquiry is within the scope of authority of the agency; (2) the demand is not too indefinite; and (3) the information sought is reasonably relevant to the authorized inquiry. *United States v. Morton Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950). The record reflects that these criteria have been satisfied.

Section 20(a)(6) of the Act, 29 U.S.C. § 669(a), authorizes the Secretary to determine, following a written request by an employer or authorized representative of any employee specifying with reasonable particularity the grounds on which the request is made, whether any substance normally found in a place of employment has potentially toxic effects in such concentration as was found. The request in the instant case centered around allegations that there is an unusually high incidence of cancer among the employees at the Belle plant. Without belaboring the obvious, we conclude that an investigation made pursuant to such allegations is well within the authority of NIOSH, and du Pont does not seriously contend otherwise. That being the case, the Court would conclude, *a fortiori,* that the information requested is relevant and certainly the terms of the demand are not indefinite.

Actually, the main thrust of du Pont's argument against the enforcement of the subpoenas is that "the medical records of [du Pont's] employees are protected by a Constitutional right of privacy and cannot be arbitrarily disclosed."

■ Assuming, without deciding, that du Pont, in its status as an employer, has standing to raise the "right of privacy" issue, we must first determine what the real issue is respecting such position. While it is recognized that there is no general constitutional right to privacy, "[v]arious guarantees create zones of privacy." *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510. We believe that the information sought in this litigation is protected. Whether the zone of protection falls within any or all of the guarantees of the First[1], Fourth[2], or Fifth[3] Amendments, or rests on the penumbras of the Bill of Rights[4], is not therefore important.

However, the paramount issue here is not whether a right of privacy exists respecting the information sought, but rather whether the record indicates that such right will be abridged. We think not.

In its substantive context, we are of the opinion that this case is controlled by the teachings of *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The *Whalen* court was faced with resolving the constitutional question of whether that part of a New York statute[5] which required the reporting to the state the names and addresses of persons who receive Schedule II drugs prescribed by a physician violated the Fourteenth Amendment as constituting an unwarranted intrusion on such person's right of privacy.

The three-judge district court, *Roe v. Ingraham,* 403 F.Supp. 931 (S.D.N.Y.1975),

1. *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

2. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

3. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

4. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

5. New York Public Health Law, McKinney's Consol. Laws, c. 45 § 3300, *et seq.*

held that the patient-identification portion of the statute clearly intruded upon the doctor-patient relationship, a constitutionally protected zone of privacy. The district court, while noting that the state interest embodied in the statute was compelling, also realized that ". . . state regulation may not be achieved by means which sweep unnecessarily broadly . . . ." 403 F.Supp. 931, 937. The district court so held notwithstanding that the statute had security provisions designed to prevent public disclosure of the reported information.

In reversing the court below, Justice Stevens, speaking for a unanimous Court, concluded that the reporting requirement did not on its face pose a sufficiently grievous threat to establish a constitutional violation. It was pointed out at 429 U.S. p. 602, 97 S.Ct. p. 878:

"Even without public disclosure, it is, of course, true that private information must be disclosed to the authorized employees of the New York Department of Health. Such disclosures, however, are not significantly different from those that were required under the prior law. Nor are they meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care. Unquestionably, some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention. Nevertheless, disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient. Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy." [Footnote omitted].

In short, the Court held that there was no evidence that the portion of the statute in question would be improperly administered. *Whalen v. Roe*, supra, at p. 601, 97 S.Ct. 869.

Similarly, no evidence has been adduced which would show or even tend to show that the information sought to be gathered in the instant case would be used improperly.

At the hearing on the cross-motions, NIOSH assured the Court that it will treat the information as confidential. Indeed, departmental regulations, 45 C.F.R. § 5.71(a), prohibit the public disclosure in individually identifiable form of the information in medical and personnel files without the person's consent. NIOSH has further assured the Court that the medical information obtained in this case under the subpoenas is and will be subject to this protection.

In addition, subsection 552(b)(6) of the Freedom of Information Act contains a specific exemption for "personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. . ." The Court holds that such disclosure would constitute such invasion of personal privacy. Therefore, NIOSH would be prohibited by law from releasing the protected information gathered from the medical and personnel files, or disclosing same to any unauthorized persons.

Du Pont further argues that even in view of the foregoing, no adequate assurance exists that NIOSH would keep the information confidential. First of all, the Court specifically orders NIOSH and the Secretary to insure that the information be kept confidential and to otherwise comply with all the applicable statutory and regulatory provisions pertaining to keeping the subject matter confidential. We think that surely one must assume that litigants will obey court orders. Once we assume otherwise, then our system of jurisprudence is in serious trouble.

In addition, and as *Whalen* observes:
". . . And the remote possibility that judicial supervision of the evidentiary use of particular items of stored information will provide inadequate protection against unwarranted disclosure is surely not a sufficient reason for invalidating

the entire patient identification program." [Footnote omitted]. 429 U.S. at pp. 601–602, 97 S.Ct. at p. 877.

In view of the foregoing, we thus conclude and declare that the subject subpoenas duces tecum are valid and enforceable. However, the Court desires that it be known to the parties that the Court joins in the concluding words of Justice Stevens in *Whalen* and wholeheartedly concurs with the theme of that statement:

"A final word about issues we have not decided. We are not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files. The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces and the enforcement of the criminal laws, all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures. Recognizing that in some circumstances that duty arguably has its roots in the Constitution, nevertheless New York's statutory scheme, and its implementing administrative procedures, evidence a proper concern with, and protection of, the individual's interest in privacy. We therefore need not, and do not, decide any questions which might be presented by the unwarranted disclosure of accumulated private data— whether intentional or unintentional—or by a system that did not contain comparable security provisions. We simply hold that this record does not establish an invasion of any right or liberty protected by the [Constitution]." 429 U.S. at pp. 605–606, 97 S.Ct. at p. 879.

In view of the foregoing, judgment will be entered in favor of respondents.